FIBERGLASS COMPONENT
PRODUCTION, INC.,
Plaintiff,

v.

REICHHOLD CHEMICALS, INC.,
a North Carolina corporation,
Defendant.

Civil Action No. 96–B–813.

United States District Court,
D. Colorado.

Nov. 18, 1997.

David G. Palmer, Brian L. Duffy, Craig V. Richardson, Gibson, Dunn & Crutcher, Denver, CO, for Plaintiff.

Bobbee J. Musgrave, B. Lawrence Theis, Perkins Coie, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this diversity case removed from the District Court of Prowers County, Colorado, defendant, Reichhold Chemicals, Inc. (RCI) moves for summary judgment, pursuant to Fed.R.Civ.P. 56, on the claims of plaintiff, Fiberglass Component Production, Inc. (FCP). FCP brings claims for: 1) breach of express warranty; 2) breach of implied warranty of fitness for particular purpose; 3) breach of implied warranty of merchantability, 4) false representation; 5) negligent misrepresentation; and 6) violation of the Colorado Consumer Protection Act, sections 6–1–105 *et seq.*, C.R.S. Second Amended Complaint. After consideration of the motion, briefs, and counsels' argument, I will deny the motion.

### I.

Unless otherwise noted, the following facts are undisputed. This action between RCI, a chemical products manufacturer, and FCP a purchaser of one of RCI's products, concerns a polyurethane resin which FCP purchased from George C. Brandt, Inc. (Brandt), an RCI distributor. FCP, formed in 1981, is located in Lamar, Colorado and fabricates laminated fiberglass products. Although there are automated lamination processes, FCP laminates its products by hand. FCP manufactures housings for air conditioning systems for installation on the top of light rail transit systems and buses.

Laminated fiberglass products are made by adding a resin to raw fiberglass. Resins, however, are inherently flammable. Therefore, chemical additives are added to resins to reduce the smoke and flammability of the finished product. The resin additives create what is called a "filled" system. The additives, or fillers, thicken the resin mixture making it more difficult to handle and more difficult to achieve a uniform amount of resin and fiberglass when laminating by hand.

FCP has used fire retardant resins since the mid 1980's. Because FCP produces housings that are used in public transportation systems, it is critical to use resins that, in the event of a fire, are low in flammability and generate low amounts of smoke. The fiberglass components used in the production of the light rail cars must meet smoke production and flammability specifications measured by various American Society of Testing Materials (ASTM) tests. Specifically, fiberglass component parts containing resins must pass ASTM E–662 smoke test requirements.

FCP used Ashland Chemical's Hetron 325 (Hetron) from the mid 1980's until it switched to the RCI Dion 6657 (RCI 6657) resin in 1995. The Hetron resin met the smoke, flammability, and strength requirements of FCP's customers. (H.Ferdow Depo., Def. Ex. 1, p. 341). However, FCP was unhappy with the ugly yellow color of the Hetron resin. (C.Ferdow depo. Def. Ex. 5, p. 79). Also, FCP was unhappy with the lack of technical support from its prior resin supplier. Resp. Ex. 2.

In the summer of 1994, Wally McClellan (McClellan), a salesman for Brandt, approached Lewis Johnson (Johnson), FCP's plant manager, about switching to the RCI 6657 resin. Pltf. Ex.1. McClellan gave Johnson the RCI 6657 product bulletin. Def. Ex. 2, McClellan Depo. p. 218. Later, McClellan

supplied FCP with two 5 gallon samples of the RCI 6657 resin.

FCP attempted to fabricate with the RCI 6657 resin but was unsuccessful with the formula contained in the Product Bulletin which called for 52% aluminum trihydrate (ATH), and 48% RCI 6657 resin. Pltf. Ex.1 and Ex.2., p. 245–46. McClellan then volunteered to contact RCI in an effort to obtain technical assistance for FCP Def. Ex.4, Johnson Depo. pp. 117–118. In September 1994, RCI sent Richard Lewandowski (Lewandowski), a specialist in the highly technical area of low smoke resins, to FCP's plant to develop a workable formula using RCI 6657. During Lewandowski's visit to the FCP plant, a workable formula, different from that contained in RCI's Product Bulletin, was developed. The parties dispute whether Lewandowski developed a workable formula alone or together with Joanne Orozco, an FCP plant foreman. The resulting formula contained 22 lbs. of RCI 6657 resin, 19 lbs. of ATH, 2 lbs. of antimony and a half bucket of cabosil. Pltf. Ex. 3, Lewandowski Depo. pp. 84–85.

Before FCP began using RCI 6657 in its production process, it needed proof that the resin would pass the industry tests based on the specifications required by its customers. Lewandowski, aware of the testing requirements, prepared fiberglass test panels and offered to test them at RCI's cost. RCI ran a smoke density test on the FCP test panels on January 23, 1995. The test results showed that the fiberglass panels tested at "68" for flaming exposure at 4 minutes. This result was well under the "less than 300" test result referenced in Lewandowski's letter to FCP written after his trip to the FCP plant. Def. Ex. 15, p. 5. Based on the "68" result, FCP purchased the RCI 6657 resin and began using it in production. Eventually, the air conditioning housings produced with RCI 6657 were installed in rail cars in San Francisco, San Diego and Denver. The parties dispute whether the housings were installed in rail cars in Portland. However, apparently FCP produced three prototypes of the Portland units made with the RCI resin. Resp. Brief. Corr. Ex. 32, ¶ 3. *Id.*

In late summer 1995, FCP received field reports that its air conditioner housings were developing cracks. As a result of these reports, FCP initiated additional testing. Hauser Laboratories performed tests on panels made with the RCI 6657 resin. The Hauser smoke test results showed an average of over 300 for flaming exposure at 4 minutes. Def. Ex. 17, p. 2; Pltf. Ex. 39. FCP states that Lewandowski was never able to duplicate the January 1995, 68 smoke test result. Resp. Brief, p. 3. Based on the additional test results, FCP initiated a product recall and is rebuilding the air conditioning units with complying resin. *Id.* at 3–4.

## II.

### *SUMMARY JUDGMENT STANDARD*

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in

Rule 56(c), except the pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. at 2512; *Mares,* 971 F.2d at 494.

### III.

#### A. *Claim 1–Breach of Express Warranty*

■ To recover for breach of express warranty, a plaintiff must prove that: 1) a warranty existed; 2) the defendant breached the warranty; 3) the breach proximately caused the losses claimed as damages; and 4) timely notice of the breach was given to defendant. *See* CJI–Civ.3d 14:6 (1990); *Palmer v. A.H.Robins Co., Inc.,* 684 P.2d 187 (Colo. 1984).

■ In its second amended complaint, FCP alleges that:

"Reichhold ... expressly warranted the Resin to meet ASTM–662 smoke specifications when used in a filled system. In particular, Reichhold ... expressly warranted the Resin to meet these smoke requirements when used in FCP's manufacturing process with the Reichhold Mixture."

Second Amended Complaint ¶ 36.

RCI moves for summary judgment arguing, *inter alia,* that RCI was never made aware of the specifications required by FCP and, thus, RCI could not have expressly warranted their resin. RCI presents evidence that McClellan, the distributor's representative, specifically asked FCP plant manager Lewis Johnson what technical specifications FCP was required to meet and Johnson did not know. Def. Ex. 2, McClellan Depo. pp. 51–52. However, FCP points to Lewandowski's testimony that in a meeting that took place on or before January 19, 1995, he saw a specification for the San Francisco project that required a test result under either 150 or 100. Pltf. Ex. 3, Lewandowski Depo., pp. 252–53. It is undisputed that the January 1995 test result provided by RCI was 68, which was well within any smoke test specification of FCP's customers. Pltf. Ex. 3, Lewandowski Depo., pp. 81–82.

■ RCI also argues that it is entitled to summary judgment on the express warranty claim because the RCI 6657 resin was sold to FCP with FCP's knowledge of the warranty disclaimer contained in the Reichhold 6657 Product Bulletin which stated, in pertinent part:

We warrant that our products will meet our written specifications. Nothing herein shall constitute any other warranty express or implied including any warranty of merchantability or fitness....

Def. Ex. 3.

FCP responds that it is not suing RCI for breach of warranties contained in its Product Bulletin, but rather on the alleged representations made about the special formula developed for FCP by Lewandowski. Resp. Brief p. 16. It is undisputed that FCP could not achieve a satisfactory product following the recipe provided in RCI's Product Bulletin. Pltf. Ex. 3, Ex. 33. RCI knew that before FCP would purchase and use RCI 6657, it had to meet applicable smoke standards. Def. Ex. 24. Also, there is ample evidence to show that Lewandowski developed a special formulation for FCP using RCI 6657. *See e.g.* Pltf. Ex. 1; Ex. 4. Thus, RCI's arguments based on the Product Bulletin fail.

FCP alleges that RCI expressly warranted Reichhold 6657 resin to meet ASTM E–662 smoke requirements. C/O ¶ 36. The formula Lewandowski developed for FCP using Reichhold 6657 consisted of:

| | |
|---|---|
| Dion 6657 resin | 100 parts |
| ATH filler | 97 parts |
| Antimony trioxide | 6 parts |
| Cab–O–Sil thixorope | 1 part |

Pltf. Exh. 12. In a letter that Lewandowski sent to FCP which contained his formula, Lewandowski stated: "[t]he part made I feel would be satisfactory in production and should give the low flame spread and smoke (less than 300) desired." *Id.* Test panels using the RCI 6657 resin were tested by RCI in January 1995 at its lab. Def. Ex. 1; Ex. 4. The RCI test report stated that the RCI 6657 resin was tested on January 16, 1995, using the ASTM E–662 method with a result of 68 smoke density. Def.Exs. 12, 14 p. 3; Lewandowski Depo. pp. 205–07. Thereafter, Lewandowski wrote a letter to Lewis Johnson at FCP in which he stated, "[t]he data obtained 01/95 was for smoke density and was compared to spec to qualify the formulation." Also, the May 29, 1996, Scheduling Order, signed by both parties, contained the following undisputed fact:

> Reichhold completed its testing of the panels on January 23, 1995, and provided the smoke and flame test results to FCP shortly thereafter. The test results showed that the panels were well below applicable smoke and flame limits, and therefore met FCP's requirements.

Scheduling Order, p. 4, ¶ 13.

FCP's summary judgment evidence conflicts with that submitted by RCI. Thus, there is a genuine issue of material fact in dispute about the existence of an express warranty.

RCI also seeks summary judgment on the basis that FCP failed to give timely notice of the alleged breach. Again, the evidence is in conflict.

A buyer "must within a reasonable time after he discovers or should have discovered any breach, notify the seller of [the] breach or be barred from any remedy." Section 4–2–607(3)(a), C.R.S.; *White v. Mississippi Order Buyers, Inc.,* 648 P.2d 682, 683 (Colo.App.1982). The determination of what is a reasonable time for notice of breach depends on the circumstances of each case. *Cooley v. Big Horn Harvestore Systems, Inc.,* 813 P.2d 736, 740 (Colo.1991). The

purposes of the notice requirement are to allow the seller to: 1) correct any defect; 2) prepare for negotiation and litigation; and 3) protect itself against stale claims asserted after it is too late for the seller to investigate them *A.H. Robins,* 684 P.2d at 206.

RCI's argument that FCP's notice of breach was untimely is supported in the record before me. However, FCP provides evidence that their notice of breach was within a reasonable time after it discovered the breach. Thus, whether the time it took for FCP to notify RCI of breach was reasonable is a question for the jury.

RCI also asserts that it is entitled to summary judgment on claim 1 because FCP failed to reject the Reichhold 6657 resin in a timely manner. I disagree.

Acceptance of goods occurs after the buyer has a reasonable opportunity to inspect them and affirmatively accepts or fails to reject the goods. Section 4–2–606, C.R.S. Acceptance may be revoked if the goods do not conform to the contract, and the buyer notifies the seller of its revocation of acceptance "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." Section 4–2–608(2), C.R.S.

As stated, the parties have produced competent conflicting evidence which supports their respective positions. Thus, whether the time which elapsed before FCP revoked its acceptance or rejected the RCI 6657 resin was reasonable is also a question for the jury.

B. *Claim 2–Breach of Implied Warranty of Fitness for Particular Purpose and Claim 3–Breach of Implied Warranty of Merchantability*

As an initial matter, I will address RCI's arguments common to claims 2 and 3.

1. *Product Bulletin*

RCI argues that its Product Bulletin contained express disclaimers of all implied warranties. In response, FCP reiterates its position that claims 2 and 3 do not arise from

the Product Bulletin but rather from implied warranties attributable to the Lewandowski formula containing RCI 6657 resin. For the reasons stated in section III(A), *supra,* I will deny summary judgment on claims 2 and 3 based on Product Bulletin disclaimers. Based on this ruling, it is irrelevant whether FCP had actual knowledge of the Product Bulletin disclaimers.

### 2. *Independent laboratory testing*

■ RCI contends that FCP's failure to have the Resin 6657 panels tested at a certified independent laboratory negated the existence of any implied warranties.

> Section 4–2–316(3)(b), C.R.S provides that: "[W]hen the buyer before entering into the contract has examined the goods or the sample ... as fully as he desired or has refused to examine the goods, there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him...."

Moreover, "[i]f a buyer unreasonably fails to examine the goods before he uses them, resulting injuries may be found to result from his own action rather than ... from a breach of warranty." § 4–2–316(3)(b), Official Comment 8.

It is undisputed that: 1) FCP received two five-gallon samples of Resin 6657 from Brandt; 2) after FCP attempted unsuccessfully to fabricate with the first five-gallon sample, Lewandowski went to FCP's facilities on two occasions and developed a modified formula using Resin 6657 for FCP's use in production; 3) RCI tested fiberglass panels made with the modified Resin 6657; and 4) the RCI test result was a 68. RCI contends that FCP unreasonably failed to examine the product by not conducting independent laboratory testing. FCP states, however, that the Denver, San Diego, and San Francisco projects did not require testing at an independent laboratory.

### a. *Denver and San Diego projects*

According to FCP, the Denver and San Diego contracts were identical. Both projects used the National Fire Protection Association 130 Standard for Fixed Guideway Transit Systems (1995 Edition) (NFPA 130) to establish the specifications for their contracts. MSJ Ex. 31. The NFPA 130 minimum performance requirements for flammability and smoke emissions were, depending on the material tested, ASTM E–662 $D_5$ (1.5) G100 and ASTM E–662 $D_5$ (4.00) ≤200. *Id.* However, the NFPA 130 contained no requirement that tests be conducted at an independent laboratory. *Id.* at p. 130–15.

### b. *San Francisco project*

According to competent evidence before the Court, the San Francisco specifications include no "independent" lab testing requirement. MSJ Ex. 27 p. 19–29. The San Francisco project smoke emissions requirements were "$D_5$ shall not be greater than 100 within 90 seconds after start of test and 200 within 4 minutes from start of test." *Id.* at p. 19–31.

### c. *Portland project*

RCI points to MSJ Ex. 20 to buttress its argument that FCP was required to obtain independent lab testing. In a memo from Sutrak Engineering to FCP, the writer encloses information from the Portland project which states, in part, "[i]ndependent laboratory certification is required for all materials, including successful compliance with these requirements." *Id.* at p. 3. The document also contains the following test specifications: ASTM E 662 $D_5$(1.5) ≤100 and ASTM E 662 $D_5$ (4.00) ≤200. *Id.* at p. 1. *See also* MSJ Ex. 26 p. 1. However, FCP submits evidence that it did not begin production of the Portland units until after October 1995, when it received the failing smoke test results. Resp. Brief. Corr. Ex. 32, ¶ 3.

Under these circumstances, I will deny RCI's motion for summary judgment on claims 2 and 3 based on § 4–2–316(3)(b), C.R.S., for failure to test the RCI resin.

### C. *Claim 2—Breach of Implied Warranty of Fitness for a Particular Purpose— § 4–2–315, C.R.S.*

To establish an implied warranty of fitness for a particular purpose, the plaintiff must demonstrate that: a) the product was to be used by the buyer for a "particular purpose"

different from its ordinary purpose; b) the seller knew of the buyer's "particular purpose;" c) the seller knew that the buyer was relying on the seller's skill to provide a product that would satisfy the "particular purpose;" and d) the buyer in fact relied on that skill. § 4–2–315, C.R.S. and Official Comments 1 and 2; *Blockhead, Inc. v. Plastic Forming Co., Inc.*, 402 F.Supp. 1017, 1024 (D.Conn.1975).

### 1. *"Particular purpose"*

■ An implied warranty of fitness for a particular purpose is created if the seller knows that the buyer is relying on its expertise to provide a suitable product for its needs. Section 4–2–315, C.R.S. A particular purpose is "a specific use by the buyer which is peculiar to the nature of his business," and "differs from the ordinary purpose for which the goods are used." Section 4–2–315, comment 2; *see also A.H. Robins*, 684 P.2d at 209.

FCP alleges in claim 2 that "Reichhold … impliedly warranted the Resin as used in the Reichhold Mixture to be suitable for the particular purpose of being mounted on railcars and buses that must pass ASTM E–662 smoke requirements." Second Amended C/O, ¶ 42.

RCI argues that it is entitled to summary judgment, as a matter of law, on claim 2 because FCP's use of RCI 6657 was exactly what the resin was designed for and is, therefore, not "a specific use by the buyer which is peculiar to the nature of his business." The parties agree that the RCI 6657 resin is "a … resin designed to be used in a filled system for applications where both Class I Flame Retardance and Low Smoke Density are required." SJ Brief, p. 27, quoting the Product Bulletin, Def.Ex. 3. FCP agrees also that RCI is correct that it needed a resin that was appropriate for low smoke applications in the transportation industry. Resp. Brief, p. 27. FCP argues, however, that in addition to its ordinary purpose, it used RCI 6657 for the "particular purpose" that RCI 6657 pass ASTM E–662 requirements.

It is undisputed that FCP could not and did not use RCI 6657 in the proportions stated in the Product Bulletin. Rather, Lewandowski, either alone or with Orozco's assistance, developed a formula for FCP's use which, according to RCI's test, achieved a test result that met FCP's ASTM E–662 requirements. This, according to FCP, constituted a "specific use of the product which is peculiar to the buyer."

In support of its argument, FCP cites *Colorado–Ute Elec. Ass'n, Inc. v. Envirotech Corp.*, 524 F.Supp. 1152 (D.Colo.1981) in which the Court held that where the seller knew that the product, a pollution control precipitator, was being purchased to meet increasingly stringent air quality regulations, there was an implied warranty that the product would perform at a level which would satisfy the regulations. Under these circumstances, the Court found an implied warranty of fitness for a particular purpose.

Here, the ordinary purpose of the Reichhold 6657 resin is not to provide low smoke density so as to comply with ASTM E–662 smoke requirements. Rather, its ordinary purpose is for use in low smoke/flame retardant filled systems. It is undisputed that FCP used the resin for application in its air conditioning units where Class I Flame Retardance and Low Smoke Density, the equivalent of low smoke/flame retardant characteristics, were required. However, there is evidence that FCP's purpose in using Resin 6657 was more specific than its ordinary purpose. In addition to the general, or ordinary, requirement that RCI 6657 resin possess low smoke and flame retardant characteristics, the resin was required to meet ASTM E–662 requirements. Under these circumstances, a jury could find that an implied warranty for a particular purpose existed. Thus, I deny RCI's motion for summary judgment.

### 2. *Seller's knowledge of particular purpose*

■ RCI states that it could not have known of FCP's particular purpose of producing fiberglass parts that "must pass ASTM E–662 smoke requirements" because "FCP [did] not know what that standard [was]." MSJ Brief p. 24. However, as I

discussed *supra* at section III B(2)(a)-(c), RCI's exhibits 20, 27, and 31 contain the precise ASTM E–662 specifications required by FCP's customers. Also, FCP proffers substantial evidence that RCI knew that FCP's products were required to pass ASTM E–662 smoke requirements. *See e.g.,* Resp. Corr. Ex. 3, Lewandowski Depo., pp. 81–83; Reply Ex. A, pp. 103-04, 113; MSJ Ex. 15.

### 3. *Seller's knowledge of Buyer's reliance and*

### 4. *Actual Reliance*

■ Existence of an implied warranty of fitness for a particular purpose "depends in part upon the comparative knowledge and skill of the parties." *Blockhead,* 402 F.Supp. at 1024. Where the seller does not have superior knowledge upon which the buyer is entitled to rely, there can be no implied warranty of fitness for a particular purpose. *Id.; H.B. Fuller Co. v. Kinetic Systems, Inc.,* 932 F.2d 681, 688–89 (7th Cir.1991).

■ RCI argues that it does not have superior knowledge because "FCP designed the fiberglass air conditioner housings, selected the hand-lamination method of fabricating fiberglass," and "had fifteen years of experience in hand-laminating fire retardant resins in filled fiberglass systems." MSJ Brief, p. 25. It concludes, therefore, that "FCP is the expert in transportation industry requirements." *Id.* RCI's argument misses the mark.

FCP does not dispute that it is expert in the application and use of resins in its production of fiberglass component parts. However, the expertise in question concerns the low smoke and flammability characteristics of resins, not the application or use of these resins in fiberglass component production.

The exhibits before me reveal substantial evidence that RCI is an expert in low smoke resins. RCI offers technical support services to its customers. Resp. Ex. 36, Reich Depo., p. 30. Also, RCI utilized Lewandowski, a specialist in fire retardant resins, Resp. Ex.35 p. 72, in offering technical support services to its customers. Moreover, Lewandowski was brought in as part of RCI's "technical team" to make recommendations to customers about fire retardant resins based on their specifications. Resp. Ex.36 pp. 25–27.

There is also competent evidence that FCP relied on RCI's expertise in recommending and formulating a low smoke resin for FCP's use. FCP switched to RCI, in part, because FCP could not obtain technical support from its prior resin supplier. Resp. Ex.2. Also, RCI promised FCP that it would provide it "continued support and [become] a responsible care provider for [their] resin system." Resp. Ex.3 at 104:1–3; Ex. 29. Lewandowski was sent to FCP to troubleshoot the Resin 6657 formula so that it would be workable for FCP's production needs. Resp. Ex.1. Also, according to FCP, it saw Lewandowski as a person with superior knowledge about resins. Resp. Ex.2, Johnson Depo. 254:20 to 255:1 ("[Lewandowski][told] me ... that he had to go to NASA to work with them on a gel coat problem, and so I assumed he knew everything there was to know about fiberglass").

Under these circumstances, I will deny RCI's motion for summary judgment on claim 2 for breach of the implied warranty for a particular purpose based on its contention that RCI did not rely on RCI.

### D. *Claim 3–Breach of Implied Warranty of Merchantability*

An implied warranty of merchantability exists in all contracts for the sale of goods unless disclaimed. Section 4–2–314; C.R.S. To be "merchantable," the goods must be fit for their ordinary purpose. Section 4–2–315, comment 2.

### 1. *Product Bulletin*

Relying on its Product Bulletin, RCI argues that it contained express disclaimers of all implied warranties. FCP reiterates its position that claim 3 does not arise from the Product Bulletin but rather from implied warranties attributed to the Lewandowski formula containing RCI 6657 resin. FCP alleges further that "[t]he Resin as used in the Reichhold Mixture was not of merchantable quality at the time of sale." However, as discussed in section III A, *supra,* summary

judgment will not lie based on the Product Bulletin.

### 2. *Breach of Implied Warranty of Merchantability*

■ To be "merchantable," goods must be fit for their ordinary purpose. § 4-2-315, comment 2. RCI argues that if an implied warranty of merchantability arose, it was not breached. In support of this argument, RCI produces evidence that tests performed on fiberglass made with the RCI 6657 resin confirmed that it was fit for both its ordinary purpose and FCP's alleged particular purpose. Def. Ex. 20; Pltf. Ex. 37, Pouttu Decl. ¶ 2; Strong depo., p. 173. There is, however, a genuine dispute of material fact about which fiberglass panels were used in various tests. Pltf. Ex.37, Pouttu depo. ¶ 2. Also, test results on panels using the Lewandowski formula differ greatly. It is undisputed that the January 1995 smoke test performed by RCI resulted in a 68. This result is evidence that the RCI 6657 resin fit the ordinary and particular purpose for which it was used by FCP. However, there is also evidence that other panels tested with the Lewandowski formula produced nonconforming results. Resp. Ex. 41 (537.7 test result). Thus, a genuine issues of material fact exist whether the implied warranty of merchantability was breached. Consequently, I may not grant summary judgment on this basis.

### E. *Consequential Damages*

FCP seeks consequential damages resulting from its recall of the air conditioner units made with the allegedly defective RCI 6657 resin. RCI contends that FCP is not entitled to recover consequential damages because 1) RCI's Standard Terms and Conditions of Sale and its Product Bulletin expressly exclude liability for consequential damages and limit the buyer's remedy to replacement of the RCI 6657 resin and 2) any such damages resulted from FCP's failure to conduct pre-production fiberglass testing.

### 1. *Standard Terms and Conditions of Sale*

■ RCI seeks summary judgment on all of FCP's warranty claims arguing that the disclaimers contained in RCI's Standard Terms and Conditions of Sale were binding on FCP as an ultimate purchaser from RCI's supplier, Brandt, Inc. FCP states it is not bound by the Standard Terms and Conditions because it never knew of their existence.

It is undisputed that RCI's Standard Terms and Conditions of sale were printed on the back of its sales invoices. MSJ Brief, p. 19. It is also undisputed that RCI sold the RCI 6657 resin to its distributor George C. Brandt, Inc. Thus, if Brandt received sales invoices containing the Standard Terms and Conditions, arguably, FCP as the ultimate buyer could be held to the warranty exclusions contained in the Standard Terms and Conditions.

During discovery, FCP requested RCI to produce all documents from RCI to Brandt, Inc. that related to the RCI 6657 resin. Pltf. Ex. 30. However, no Standard Terms and Conditions purportedly provided to Brandt, Inc. by RCI were produced by RCI or Brandt, Inc. Indeed, according to RCI's counsel, all relevant communications between RCI and Brandt, Inc. relating to the RCI 6657 resin had been produced. Ex. 31. RCI submits Exhibit 34, its sales invoice containing the Standard Terms and Conditions printed on the back. However, the front of Exhibit 34 is blank. On its face, therefore, Exhibit 34 is not relevant to this issue. The only evidence before me that RCI provided Brandt, Inc. with it Standard Terms and Conditions of sale is the affidavit of RCI employee Libby Bennett (Bennett) in which she states that it is "the routine practice of Reichhold to include a copy of the Standard Terms and Conditions as part of the invoice for each and every sale of its goods." Reply Ex. G. However, Bennett's affidavit does not address RCI's failure to produce an actual RCI sales invoice billed to Brandt, Inc. Under these circumstances, in light of the absence of any RCI sales invoices to Brandt, Inc., it is a question of Bennett's credibility whether RCI provided Brandt, Inc. with the Standard Terms and Conditions containing the exclusion of consequential damages. This is an issue for the jury to decide.

Therefore, I may not grant RCI's summary judgment motion based on the exclusion of warranties contained in the Standard Terms and Conditions.

■ Next, RCI argues that although there is no privity between it and FCP, according to Colorado law, the disclaimers contained in the Standard Terms and Conditions operate against FCP regardless of FCP's knowledge.

In Colorado, "to the extent that [a] contract of sale contains provisions under which warranties are excluded or modified, or remedies for breach are limited, such provisions are equally operative against beneficiaries of warranties...." § 4-2-318, C.R.S., Comment 1; *Wenner Petroleum Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 748 P.2d 356, 357 (Colo. App.1987). Thus, if the sales contract between RCI and Brandt, Inc. contained the Standard Terms and Conditions, the exclusions and limitations on remedies for breach contained in the Standard Terms and Conditions operate against FCP.

FCP argues, however, that in direct dealings between it and RCI, RCI made express warranties and representations to FCP concerning the ability of the Lewandowski formula containing RCI 6657 to score a 68 on the ASTM E-662 smoke test and, thus, meet the specifications of FCP's customers. Also, according to FCP, during their direct dealings with RCI, it never informed FCP of any warranty exclusions or limitations on remedies in connection with its sales of RCI 6657 to FCP.

The Colorado state courts have not addressed the issue of the effect of a manufacturer's direct dealings with an ultimate purchaser of its goods on warranty exclusions or limitations on remedies. However, this issue was addressed in Judge Logan's concurring opinion in *Patty Precision Products Co. v. Brown & Sharpe Mfg. Co.*, 846 F.2d 1247 (10th Cir.1988), a case based on Oklahoma state law. Judge Logan agreed with the premise that for ordinary transactions in the stream of commerce, where failure of the product causes only economic loss, the objective of protecting the ultimate buyer is not compelling because, in most cases, the ultimate purchaser may bring a suit against its immediate seller. It follows that disclaimers which are effective between the original parties should also bind "anyone asserting the liability of a defendant on a warranty that would exist but for the disclaimer." *Id.* at 1258 quoting 3 R. Anderson, Anderson on the Uniform Commercial Code § 2-316:54, at 361-62 (3d ed.1983).

In *Patty Precision*, the manufacturer had extensive dealings with the ultimate purchaser before purchase orders were executed, the manufacturer had a service engineer on the premises, the manufacturer extended express warranties to the ultimate purchaser, and the manufacturer's participation induced the purchaser's reliance on the warranties. *Id.* at 1258. Under those circumstances, Judge Logan reasoned that it is not commercially unreasonable to expect the manufacturer to communicate in clear and conspicuous terms its disclaimer of warranties to the ultimate purchaser. Therefore, by failing to communicate any warranty disclaimer, the manufacturer waived the disclaimer defense or was estopped from raising it. *Id.*

This reasoning is persuasive. Thus, in this case, based on the uncontested facts about FCP's direct dealings with Lewandowski, RCI's representative, I will deny RCI's motion for summary judgment as to FCP's request for consequential damages.

### 2. *Product Bulletin*

The RCI Product Bulletin states that "[w]e warrant that our products will meet our written specifications. Nothing *herein* shall constitute any other warranty express or implied including any warrant of merchantability or fitness." Def. Ex.3.(emphasis added.) However, as explained previously, FCP is not suing RCI for claims arising out its Product Bulletin. Rather, it is suing on the alleged direct representations and warranties made by RCI concerning the RCI 6657 in the Lewandowski formula.

### 3. *Failure of Essential Purpose*

■ If the Standard Terms and Conditions warranty exclusions are found to be applicable against it, FCP argues, in the alternative, that the warranty exclusions are

unenforceable because the damages limitation fails of its essential purpose.

In contracts for the sale of goods, the parties may limit or alter the damages recoverable by a buyer, but if the limitation fails of its essential purpose, it becomes unenforceable. Specifically, § 4–2–719(1)(a), C.R.S., states that an agreement may limit "the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts...." However, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the [Uniform Commercial Code.]" § 4–2–719(2), C.R.S.

 Generally, the failure of essential purpose exception applies only to those situations in which the buyer is left without a remedy. *Wenner Petroleum Corp. v. Mitsui & Co.*, 748 P.2d 356, 357 (Colo.App.1987). Failure of the essential purpose of a remedy is measured by whether the buyer is deprived of the substantial value of his bargain. *Id.* For example, when goods have latent defects which are not discoverable upon receipt and reasonable inspection, a limitation of remedy to return of the purchase price fails of its essential purpose. *Id.* (citations omitted).

Here, there is competent evidence that FCP did not know until October 1995, that the fiberglass panels fabricated with the RCI 6657 resin failed applicable smoke standards. Corr. Resp. Ex. 11, 1 3. Also, physically inspecting the RCI 6657 resin or the panels made using it, would not have disclosed the results that would be produced by smoke tests. Moreover, it can be argued that the January 1995 RCI test result of 68 was a "reasonable inspection" of the RCI 6657 resin by FCP.

FCP contends it has or will incur damages in excess of $1.2 million in recalling and retrofitting the air conditioning units containing housings made with the RCI 6657 resin. *Id.* The cost of the RCI 6657 resin represents a minute fraction of the total cost of the recall and retrofit. *Id.* Under these circumstance, limiting FCP's damages to the cost of the RCI 6657 resin would deprive FCP of the benefits of its bargain. Thus, a jury could find that any damages limitation fails of its essential purpose.

> 4. *FCP's consequential damages were caused by its failure to independently test the Lewandowski formula before beginning production*

RCI asserts that based on FCP's failure to independently test the panels produced with the Lewandowski formula, it is entitled to summary judgment on FCP's claim for consequential damages. Based on the analysis found at section III B(2), *supra*, I will deny RCI's motion for summary judgment on FCP's claim for consequential damages. *See also*, Def. Exs. 27, 31; Pltf. Ex. 2, pp. 248–49; Ex. 6, p. 151; Ex. 7, pp. 424–25.

> F. *Claim 6—Violation of Colorado Consumer Protection Act, § 6–1–105, C.R.S.*

 RCI moves for summary judgment on claim six, violation of the Colorado Consumer Protection Act, § 6–1–105, *et seq.*, C.R.S. (CCPA), on the ground that FCP lacks standing to pursue this claim. I disagree.

Standing is both a constitutional prerequisite for federal court jurisdiction and a prudential limitation on the exercise of its jurisdiction. *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir.1996). The constitutional minimum of standing is that "the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest." *Id.* As a prudential limitation, standing also requires "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In a diversity case, whether a plaintiff is within the zone of interests protected by a state statute and, thus, has standing to pursue the claim in federal court, is determined by state law. *See Valley Forge Christian College v. Americans United for Separation of Church*

*and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

RCI states that FCP lacks standing to obtain relief under the CCPA because FCP is not among "the intended beneficiaries of the Act." MSJ Brief, p. 44. In advancing this argument, RCI relies principally on *U.S. Welding Inc. v. Burroughs Corp.,* 615 F.Supp. 554 (D.Colo.1985). However, in *Burroughs,* the court conceded that "Colorado courts have not addressed the issue raised here of [whether a corporation may bring suit under the CCPA....]" *Id.* at 555. Since *Burroughs* was decided, however, the Colorado courts have addressed this issue.

CCPA section 6–1–113(1), C.R.S. provides: The provisions of this article shall be available to any person in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice ...

Under the CCPA, "person" is defined as "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." § 6–1–102(6).

In *Heller v. Lexton–Ancira Real Estate Fund, Ltd., 1972,* 809 P.2d 1016 (Colo.App. 1990), *rev'd on other grounds,* 826 P.2d 819 (Colo.1992), the Colorado Court of Appeals held that the plaintiff corporation had standing to bring a claim under the CCPA because the CCPA's definition of "person" specifically includes a corporation. The Court also stated that "[w]e do not agree with the holding in *U.S. Welding, Inc. v. Burroughs Corp.* ... which held that consumers are intended beneficiaries of the Act and thus businesses do not have standing." *Id.* at 1022.

Citing *New York Life Ins. Co. v. K N Energy, Inc.,* 80 F.3d 405 (10th Cir.1996), RCI contends that I may ignore the *Heller* decision because an intermediate appellate court opinion is not binding on this Court. However, the statement to which RCI refers states:

Although we are not required to follow the pronouncements of an intermediate state appellate court, we may view such decisions as persuasive as to how the state

supreme court might rule. [citation omitted]. But see *Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1269 (10th Cir.1989)("federal court must follow an intermediate state court decision unless other authority convinces the federal court that the state supreme court would decide otherwise.").

*Id.* at 409.

RCI also cites to *Martinez v. Lewis,* 942 P.2d 1219 (Colo.App.1996), *cert. granted,* September 2, 1997, as indicative of how the Colorado Supreme Court would decide this issue. Putting aside my hesitancy about relying on a case on which a writ of certiorari has been granted, *Martinez* is distinguishable on its facts. The plaintiff in *Martinez* is a natural person, not a corporation. Thus, *Martinez* has no apparent bearing on the issue whether a corporation has standing under the CCPA. In light of the clear language in *Heller* disowning the *Burroughs* holding, I am persuaded that if a claim is within the "zone of interests" of the statute, the Colorado Supreme Court would hold that a corporation is a person entitled to bring a claim under the CCPA.

Defendant argues that for a company to bring a CCPA claim, it must show that it is within the zone of interests for which the statute was implemented. RCI characterizes this action as a "private commercial dispute" which is not within the "zone of interests" of the CCPA.

Two requirements must be satisfied to have standing: 1) the plaintiff must allege that the challenged action has caused it injury in fact, and 2) the interest sought to be protected must arguably be within the zone of interests to be protected or regulated by the statute in question. *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535, 538 (1977). The CCPA is concerned with punishing those who engage in deceptive trade practices including "[k]nowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or guaranties of goods ...." § 6–1–105(e), C.R.S. It is also a deceptive trade practice for a person to "[r]epresent[ ] that goods ... are of a particular standard, quality, or grade ... if [the

person] knows or should know that they are of another." § 6–1–1–5(g).

The transaction at issue in this case, the sale of a resin used in production of fiberglass housings for air conditioning units, may, at first glance, appear to be a private commercial dispute which is not within the zone of interests of the CCPA. However, ultimately, the air conditioning units were installed in buses and rail cars as part of mass transit systems in San Francisco, Denver, and San Diego. Allegedly, the housings did not meet the required low smoke and flame specifications in place to protect passengers in the event of a fire. Considering the potential impact on the general public, I cannot say that the interest sought to be protected is not within the zone of interests of the statute in question. *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535, 538 (1977).

### G. *Rule 17(a) real party in interest*

FCP is seeking to recover damages it incurred in replacing the allegedly defective air conditioner housings made with RCI 6657 resin. FCP is also seeking recovery of the production costs incurred by Sutrak USA, the entity to whom FCP sold the housings. MSJ Brief p. 45. RCI contends that FCP is not entitled to recover Sutrak USA's production costs because FCP is not the real party in interest as to the alleged losses of Sutrak USA. *Id.* I disagree.

FCP was formed in 1981. Sutrak Corporation (Sutrak) owns 80 percent of FCP and an unnamed German citizen owns the other 20 percent. Before 1996, Sutrak U.S.A. was a separate and independent company. In 1996, Sutrak U.S.A. became a part of Sutrak. Sutrak, Sutrak USA, and the unnamed German citizen are not parties to this action. FCP states a portion of its damages are based on pre-existing contractual and warranty obligations to its customer Sutrak USA arising from its fiberglass sales contracts with Sutrak USA.

The parties agree, as do I, that in diversity cases the identity of a real party in interest is determined by the substantive law of the forum state. *K–B Trucking Co. v.*

*Riss Int'l Corp.,* 763 F.2d 1148, 1153 (10th Cir.1985). In Colorado, "[a] seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consumer, or be affected by the goods and who is injured by breach of the warranty...." § 4–2–318, C.R.S. The purpose of this section is to free third party beneficiaries of the warranties from any technical rules as to "privity." *Id.,* Colorado Comment. It is implicit in this section that any warranty beneficiary may bring a direct action for breach of warranty against the seller whose warranty extends to it. *Id.*

Here, Sutrak USA is a third-party beneficiary of any warranties, express or implied, which arose as a result of FCP's use of RCI 6657 resin because as a buyer of FCP's housings, it could "reasonably be expected to use, consume, or be affected by the goods." § 4–2–318, C.R.S.

Colo.R.Civ.P. 17(a) provides, in pertinent part, that:

> [e]very action shall be prosecuted in the name of the real party in interest; but ... *a party* with whom or *in whose name a contract has been made for the benefit of another,* ... *may sue in [its] own name without joining with [it] the party for whose benefit the action is brought....*

*Id.* (emphasis added). The emphasized language means "that the promisee in a contract for the benefit of a third party may sue as real party in interest." *See, id.,* Advisory Committee Notes (1966). As a direct promisee of RCI's warranties, FCP is entitled under Rule 17(a) to sue on behalf of Sutrak USA, a downstream commercial beneficiary of RCI's warranties.

Also, RCI argues that a judgment in this case would not be *res judicata* as to future claims of Sutrak against them. I disagree.

*Res judicata* or claim preclusion renders an existing judgment conclusive as to the rights of the parties *or their privies* in any subsequent proceeding based on the same cause of action. *See e.g., Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313, 319 (Colo.1980); *Pomeroy v. Waitkus,*

183 Colo. 344, 517 P.2d 396 (1973).(emphasis added).

Sutrak USA is in privity with FCP through its contracts with FCP to purchase FCP's housings. Thus, any judgment FCP obtains against RCI in this litigation would be conclusive of the rights of Sutrak USA, as a privy of FCP, as to the warranties at issue in this case.

### H. *FCP's claims four, five and six for false representation, concealment and negligent misrepresentation, respectively*

RCI argues that claims four, five, and six are nothing more than a restatement of breach of implied warranty as tort claims to avoid operation of the RCI warranty disclaimers. However, as stated before, RCI's warranty disclaimers contained in the Product Bulletin and the Standard Terms and Conditions of sale, will not support summary judgment against FCP on its breach of implied warranty claims.

Also, there is competent evidence supporting FCP's negligent misrepresentation claim that is different from the evidence supporting the breach of implied warranty claims. Pltf. Ex. 27, ¶ 1; Ex. 39; Def. Ex. 1. Moreover, this claim is based, in part, on the alternative theory, that FCP received negligent advice from Lewandowski regarding the proper formula to be utilized by FCP. Resp. Brief. p. 41.

Accordingly, it is ORDERED that defendant's motion for summary judgment is DENIED.