506 P.3d 108
2021 COA 143
DREAM FINDERS HOMES LLC, a Florida limited liability company, and DFH Mandarin, LLC, a Florida limited liability company, Plaintiffs-Appellees and Cross-Appellants,
v.
WEYERHAEUSER NR COMPANY, a Washington corporation, Defendant-Appellant and Cross-Appellee.
Court of Appeals No. 20CA0002
Colorado Court of Appeals, Division III.
Announced December 2, 2021
Holland & Knight LLP, Thomas D. Leland, Maxwell N. Shaffer, Denver, Colorado; Holland & Knight LLP, Stacy D. Blank, Tampa, Florida; Holland & Knight LLP, Peter P. Hargitai, Joshua H. Roberts, Laura B. Renstrom, Jacksonville, Florida, for Plaintiffs-Appellees and Cross-Appellants
Perkins Coie LLP, Craig M.J. Allely, Michael A. Sink, Daniel Graham, Denver, Colorado; Latham & Watkins LLP, Mary Rose Alexander, Robert C. Collins III, Chicago, Illinois, for Defendant-Appellant and Cross-Appellee
Opinion by JUDGE LIPINSKY
¶ 1 Law schools teach torts and contracts as fundamentally distinct areas of the law. Students learn that " ‘contract obligations arise from promises made between parties,’ whereas ‘[t]ort obligations generally arise from duties imposed by law ... without regard to any agreement or contract.’ " Bermel v. BlueRadios, Inc. , 2019 CO 31, ¶ 20, 440 P.3d 1150, 1154 (citation omitted). ¶ 2 But, in practice, the line between tort law and contract law can blur. A party to a breached contract may assert tort claims and contract claims in the same lawsuit. So, to preserve the distinction between tort law and contract law, courts have devised the economic loss rule, which clarifies when a party whose contract has been breached may obtain damages against the breaching party under a tort theory. The rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." Town of Alma v. AZCO Constr., Inc. , 10 P.3d 1256, 1264 (Colo. 2000).
¶ 3 In this case, we consider for the first time whether a sophisticated buyer of a defective product, who received a warranty from the manufacturer of the product, may assert tort claims based on the manufacturer's alleged negligence and fraud in representing the quality of its product and failing to disclose the defect, even though the buyer received the remedy specified in the warranty and the warranty expressly excluded the very type of damages the buyer seeks to recover through its tort claims.
¶ 4 Weyerhaeuser NR Company appeals, among other rulings, the trial court's judgment entered on a jury verdict finding it liable for negligence, negligent misrepresentation, and fraudulent concealment. Dream Finders Homes LLC (Homes) and DFH Mandarin, LLC (Mandarin) (collectively, Dream Finders) cross-appeal the trial court's order directing a verdict in favor of Weyerhaeuser on their warranty claims and the court's order denying their motion for judgment notwithstanding the verdict on their Colorado Consumer Protection Act (CCPA) claim.
¶ 5 We hold that the economic loss rule bars Homes and Mandarin's negligence, negligent misrepresentation, and fraudulent concealment claims. In light of our holding on the applicability of the economic loss rule, we need not reach Weyerhaeuser's other arguments.
¶ 6 Because Homes and Mandarin conceded they received the contractual benefit for which they bargained — the remedies set forth in the warranty they received from Weyerhaeuser — we hold that the trial court did not err by granting Weyerhaeuser's motion for a directed verdict on Homes and Mandarin's warranty claims. We also hold that the economic loss rule does not generally bar CCPA claims. However, we affirm the trial court's denial of Homes and Mandarin's motion for judgment notwithstanding the verdict on their CCPA claim because they failed to prove one of the elements of the claim.
¶ 7 Thus, we reverse the judgment entered against Weyerhaeuser on Homes and Mandarin's claims for negligence, negligent misrepresentation, and fraudulent concealment; affirm the directed verdict in favor of Weyerhaeuser on Homes and Mandarin's warranty 506 P.3d 115 claims; and affirm the judgment entered against Homes and Mandarin on their CCPA claim.
I. Background Facts and Procedural History
A. The Parties
¶ 8 Weyerhaeuser designs, manufactures, sells, and distributes engineered lumber products, including joists with a fire-resistant coating used in home construction. Joists are engineered wooden I-beams used to support the first floor in a house.
¶ 9 Homes and Mandarin are separate legal entities and subsidiaries of Dream Finders Holdings, LLC. Homes is a homebuilder and contractor. It purchases "the various components of the [h]ouses" it builds, including joists. Mandarin sells the houses that Homes builds to "end-home buyers."
¶ 10 Universal Forest Products, Inc., a retailer, sells construction materials, including products manufactured by Weyerhaeuser, to home builders in Colorado through its affiliate, Universal Forest Products Lafayette, LLC. (We refer to both UFP entities as UFP.)
B. The Parties' Agreements
¶ 11 Weyerhaeuser and UFP entered into a distribution agreement on September 4, 2006. The distribution agreement governed UFP's sale of various Weyerhaeuser products, including the joists that are the subject of this case. UFP purchased joists from Weyerhaeuser under the distribution agreement. For each order of joists that UFP placed with Weyerhaeuser, Weyerhaeuser sent UFP a confirmation that incorporated by reference Weyerhaeuser's standard terms of sales.
¶ 12 In March 2015, Homes and UFP entered into a general terms agreement and several addendums to that agreement. From 2015 through 2016, Homes purchased Weyerhaeuser's Generation 2 Joists (G2 joists) from UFP.
¶ 13 Weyerhaeuser promulgated a technical bulletin and a material safety data sheet (SDS) for the G2 joists. The technical bulletin included a link to Weyerhaeuser's warranty and SDS for the joists.
¶ 14 Addendum B to Homes and UFP's general terms agreement provided that "[UFP] shall apply [SDS] information for any products brought to the job site." UFP's invoices included a link to the SDS's for the products UFP sold.
C. Weyerhaeuser's Warranty for the Joists
¶ 15 Weyerhaeuser provided at least two warranties for its joists: a general warranty for all its products, which was included in the distribution agreement and in Weyerhaeuser's standard terms of sales, and a stand-alone warranty. (We refer to both warranties as Weyerhaeuser's warranty.)
¶ 16 Weyerhaeuser's stand-alone warranty for the joists provided as follows:
For delamination, strand or component separation, inadequacy of design values (as published) or manufacturing defect covered by this warranty, Weyerhaeuser will pay reasonable costs of labor and material for the repair or replacement of the covered [j]oists, not to exceed 3 times the original purchase price of the [j]oist.
....
Weyerhaeuser's sole responsibility is as set forth in this warranty and Weyerhaeuser will not be responsible for incidental, indirect, or consequential damages.
D. The Generation 4 Joists
¶ 17 In December 2016, Weyerhaeuser informed UFP that it had changed the fire-resistant protective coating on its joists. Weyerhaeuser internally referred to the joists with the new coating as Generation 4 (G4) joists.
¶ 18 On December 20, 2016, Weyerhaeuser sent UFP a description of, and announced it was transitioning to, the G4 joists. That same month, Weyerhaeuser posted an updated technical bulletin and revised the SDS for its joists. The revised SDS said it applied to products manufactured after December 1, 2016. Homes began purchasing Weyerhaeuser's G4 joists from UFP in January 2017.
506 P.3d 116 ¶ 19 Three months later, Weyerhaeuser received a report from a home builder other than Homes that occupants of a house constructed with G4 joists had reported a "chemical-like odor from the basement" and irritation in their eyes and throat when they entered the basement.
¶ 20 On July 6, 2017, Weyerhaeuser notified dealers, distributors, and home builders of reports of odors in some houses constructed with G4 joists. Weyerhaeuser directed home builders to temporarily discontinue use of its joists manufactured after December 1, 2016. On July 18, 2017, Weyerhaeuser issued a press release stating it had "determined that recent customer feedback regarding an odor in certain newly constructed homes is related to a recent formula change to the ... [fire-resistant] coating that included formaldehyde-based resin." Weyerhaeuser announced that it "will cover the cost to either remediate or replace affected joists."
¶ 21 Weyerhaeuser offered different remediation options to builders that had installed G4 joists. Homes, which had installed G4 joists in thirty-eight houses in Colorado, selected a mechanical removal option. Weyerhaeuser contracted with a third party to remediate the joists in the thirty-eight houses that Homes had constructed with the G4 joists. After the third-party contractor performed the work, Homes acknowledged in writing that the remediation had been completed. The parties do not dispute that Weyerhaeuser paid all the remediation costs, which amounted to significantly more than the "3 times the original purchase price of the [j]oist[s]" referenced in Weyerhaeuser's stand-alone warranty.
E. The Parties' Claims
¶ 22 Despite the completion of the remediation work, Homes sent Weyerhaeuser a notice that threatened Weyerhaeuser with claims for breach of express and implied warranties, negligence, and strict products liability. In the notice, Homes demanded that Weyerhaeuser compensate Homes for the losses it had allegedly sustained as a consequence of the defect in the G4 joists, including its "hard remediation costs and legal fees incurred to date." Homes filed suit when Weyerhaeuser did not comply with its demand. Homes later amended its complaint to add Mandarin as a second plaintiff.
¶ 23 In their third amended complaint, Homes and Mandarin asserted nine causes of action against Weyerhaeuser: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) negligence; (4) negligent failure to warn; (5) negligence per se; (6) strict product liability; (7) violation of the CCPA; (8) negligent misrepresentation; and (9) fraudulent concealment. Homes and Mandarin alleged that Weyerhaeuser knew the G4 joists contained a urea-formaldehyde resin that emitted formaldehyde at a level greater than the emissions from the G2 joists; the SDSs did not disclose the known hazardous levels of formaldehyde in the G4 joists; without notice to the buyers of the G4 joists, Weyerhaeuser withdrew a previous disclosure stating that its joists "contain no added urea-formaldehyde resins"; and Weyerhaeuser made false statements to its customers.
¶ 24 Homes and Mandarin also alleged that they had incurred significant damages as a consequence of their use of the G4 joists, including, but not limited to,
hard remediation costs, and specifically the cost of labor and materials needed during the remediation; interest costs accruing as a result of the delay in expected closing dates; a portion of the salaries of Dream Finders'[s] Denver-area employees; lost return on equity; additional incentives provided to buyers; defaults on lot purchase agreements; excess carry costs; ... and lost profits.
¶ 25 Weyerhaeuser filed a counterclaim for unjust enrichment against Homes and Mandarin, asserting that it was entitled to reimbursement of any sums it paid Homes or Mandarin in excess of the cost it incurred to remediate the G4 joists in the houses that Homes built.
F. The Trial and Post-Trial Motions
¶ 26 The case proceeded to a jury trial. At trial, Homes and Mandarin's damages expert testified that Homes had incurred almost $3,000,000 in damages and that Mandarin 506 P.3d 117 had incurred approximately $17,036,814 in damages as a consequence of the delay they experienced in selling the houses built with the G4 joists. The expert said that Homes's and Mandarin's damages took the form of lost profits, "excess costs," management service fees, legal costs, financing costs, builders risk insurance, and operational expenses.
¶ 27 During the trial, the trial court granted Weyerhaeuser's motion for a directed verdict on Homes and Mandarin's warranty and negligence per se claims. Homes and Mandarin later voluntarily dismissed their strict product liability claim.
¶ 28 In a special verdict form, the jury found in favor of Homes and Mandarin on their negligence, negligent misrepresentation, and fraudulent concealment claims but found in favor of Weyerhaeuser on Homes and Mandarin's CCPA claim. The jury awarded damages of $3,000,000 to Homes and $11,650,000 to Mandarin.
¶ 29 The parties filed post-trial motions. Homes and Mandarin filed a motion for judgment notwithstanding the verdict on their CCPA claim. Weyerhaeuser filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial on all claims on which Homes and Mandarin prevailed.
¶ 30 The trial court denied the post-trial motions and entered the following judgment on the parties' claims:
• in favor of Homes in the amount of $3,000,000 and in favor of Mandarin in the amount of $11,650,000 on their negligence, negligent misrepresentation, and fraudulent concealment claims; and
• in favor of Weyerhaeuser on Homes and Mandarin's CCPA, breach of express warranty, breach of implied warranty of merchantability, and negligence per se claims.
¶ 31 The trial court took under advisement Weyerhaeuser's unjust enrichment counterclaim, which was not tried to the jury because it was an equitable claim. See Marquardt v. Perry , 200 P.3d 1126, 1130 (Colo. App. 2008) (holding that, where a case involves a jury trial on legal issues and a bench trial on equitable claims, the factual issues must first be tried to the jury, and "the court is bound by the jury's determination of factual issues common to both the legal and equitable claims"). Later, after concluding that "[a]ny benefit of paying for [the individual homeowners'] temporary living expenses flowed to Weyerhaeuser, not Dream Finders," the trial court entered judgment in favor of Homes and Mandarin on the counterclaim.
¶ 32 Among other arguments on appeal, Weyerhaeuser contends that the economic loss rule bars Homes and Mandarin's negligence, negligent misrepresentation, and fraudulent concealment claims. On cross-appeal, Homes and Mandarin assert that (1) if the economic loss rule applies to their negligence, negligent misrepresentation, and fraudulent concealment claims, the trial court erred by directing a verdict on their warranty claims; and (2) the trial court erred by denying their motion for judgment notwithstanding the verdict on their CCPA claim.
II. The Economic Loss Rule ¶ 33 We first consider the applicability of the economic loss rule to Homes and Mandarin's negligence, negligent misrepresentation, and fraudulent concealment claims. Weyerhaeuser contends that the rule limits Homes and Mandarin's ability to recover damages through claims that sound in tort because Homes and Mandarin had a contractual remedy for defects in the G4 joists; Homes and Mandarin's claims arise from post-contractual conduct; and Weyerhaeuser did not owe Homes or Mandarin, sophisticated commercial entities, independent tort duties separate and apart from the duties specified in the parties' contract. (Homes and Mandarin's interrogatory response indicates that Homes, and not Mandarin, purchased G4 joists. The statements in the interrogatory response are binding on Homes and Mandarin as judicial admissions. See Holiday Acres Prop. Owners Ass'n v. Wise , 998 P.2d 1106, 1110 (Colo. App. 2000). Despite this distinction, and even though they sought different measures of damages from Weyerhaeuser, Homes and Mandarin asserted their claims jointly. For this reason, we consider the applicability of the economic loss rule to 506 P.3d 118 those claims as though Homes and Mandarin were a single entity.)
¶ 34 We agree with Weyerhaeuser that the economic loss rule applies to Homes and Mandarin's tort claims — their negligence, negligent misrepresentation, and fraudulent concealment claims — particularly because Homes and Mandarin sought to recover through those claims categories of damages expressly excluded under the terms of the warranty they received from Weyerhaeuser.
A. Standard of Review ¶ 35 "Whether the economic loss rule precludes a particular claim raises a legal issue subject to de novo appellate review." In re Estate of Gattis , 2013 COA 145, ¶ 10, 318 P.3d 549, 552 (quoting Makoto USA, Inc. v. Russell , 250 P.3d 625, 627 (Colo. App. 2009) ).
B. Applicable Law ¶ 36 Under the economic loss rule, the same economic injury cannot give rise to both contract and tort liability. Bermel , ¶ 20, 440 P.3d at 1154-55. The economic loss rule rests on fundamental principles of contract law — contracting parties should be held to the "terms of their bargain" and should "confidently allocate risks and costs ... without fear that unanticipated liability may arise in the future." Id. at ¶ 20, 440 P.3d at 1154 (quoting Town of Alma , 10 P.3d at 1262 ). Moreover, "the threat of liability in tort for a breach of contract causing only economic losses might undermine the parties' expectations," id. , and "the possibility of simultaneous liability in tort and contract could generate confusion and unnecessary complexity in litigation," id. at ¶ 20, 440 P.3d at 1154-55.
¶ 37 Thus, the economic loss rule bars a party that suffered only economic loss as a consequence of a breach of contract from asserting a tort claim premised on the breach unless the breaching party also owed the nonbreaching party an independent duty of care under tort law. Town of Alma , 10 P.3d at 1264 ; see Yacht Club II Homeowners Ass'n, Inc. v. A.C. Excavating , 94 P.3d 1177, 1181 (Colo. App. 2003) (explaining that "[t]he key to the availability of a tort or contract actions lies in the source of the duty that forms the basis of the action"), aff'd , 114 P.3d 862 (Colo. 2005). ¶ 38 To determine whether a contracting party owes an independent common law duty of care, we consider "(1) whether the relief sought in tort is the same as the contractual relief; (2) whether there is a recognized common law duty of care; and (3) whether the tort duty differs in any way from the contractual duty." Hamon Contractors, Inc. v. Carter & Burgess , 229 P.3d 282, 293 (Colo. App. 2009). And, as we explain further below, infra Part II.C.2, we also consider whether the plaintiff's tort claims are premised on conduct that occurred before or after the parties entered into the contract. Hamon Contractors , 229 P.3d at 291-92.
C. The Economic Loss Rule Bars Homes and Mandarin's Negligence, Negligent Misrepresentation, and Fraudulent Concealment Claims
¶ 39 Before turning to the applicability of the economic loss rule to Homes and Mandarin's tort claims, we must determine which documents reflect the terms and conditions of their contract with Weyerhaeuser. We then consider whether the parties entered into their contract before or after Weyerhaeuser engaged in the negligence, negligent misrepresentation, or fraudulent concealment that Homes and Mandarin alleged. Finally, we analyze the factors set forth in Hamon Contractors to determine whether Weyerhaeuser owed Homes and Mandarin a recognized common law duty independent of any contractual duties.
1. The Contract Between Weyerhaeuser and Homes and Mandarin
¶ 40 The parties disagree which document or documents reflect the terms and conditions of Homes and Mandarin's purchase of G4 joists and, therefore, whether the conduct giving rise to Homes and Mandarin's tort claims occurred pre- or post-contract.
¶ 41 Homes and Mandarin contend that each of their individual purchase orders for joists constituted a separate contract, although they acknowledge that the warranty 506 P.3d 119 they received from Weyerhaeuser is part of their contract.
¶ 42 In contrast, Weyerhaeuser asserts that it entered into a "network of contracts" with Homes and Mandarin that included "two distribution agreements, written invoices, online standard terms, an express warranty, and sales incentive agreements." (Beginning in February 2016, Homes and Weyerhaeuser entered into annual builder agreements providing that Weyerhaeuser would send Homes rebates for purchasing its products. Weyerhaeuser does not explain how the builder agreements are relevant to the economic loss analysis, however.) ¶ 43 We agree with Weyerhaeuser that no single document reflects all the terms and conditions of Weyerhaeuser's sale of G4 joists to Homes and Mandarin. But the lack of a single document containing all such terms and conditions does not defeat Weyerhaeuser's economic loss rule argument.
¶ 44 Each of Homes and Mandarin's purchase orders for Weyerhaeuser joists was not a separate contract because the purchase orders did not recite all the terms and conditions of Homes and Mandarin's purchase of the joists; those terms and conditions were set forth in the distribution agreement, the general terms agreement, and the other documents contained within the network of contracts. See Shell W. E & P, Inc. v. Pel-State Bulk Plant, LLC , 509 S.W.3d 581, 587-88 (Tex. App. 2016) ("A master service agreement does not provide for the performance of any specific work or any specific price; instead it requires the issuance of work orders and, upon acceptance of the work orders, they become part of the master service agreement."); cf. Meredith v. Ramsdell , 152 Colo. 548, 552, 384 P.2d 941, 944 (1963) ("It is elementary that an agreement may be evidenced by several writings, which, when connected, show the parties, subject matter, terms, and consideration.").
¶ 45 Our supreme court has held that the economic loss rule can apply when contractual duties arise from a network of interrelated agreements between commercially sophisticated parties. BRW, Inc. v. Dufficy & Sons, Inc. , 99 P.3d 66, 72 (Colo. 2004). (Homes and Mandarin do not deny that, as home builders and sellers, they are commercially sophisticated.) The BRW court explained that,
[i]n such a contract chain, the parties do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it. Even though a [party] may not have the opportunity to directly negotiate with [another party], it has the opportunity to allocate the risks of following specified design plans when it enters into a contract with a party involved in the network of contracts. In this situation, application of the economic loss rule encourages a [party] to protect itself from risks, holds the parties to the terms of their bargain, enforces their expectancy interests, and maintains the boundary between contract and tort law. Id.
¶ 46 A number of documents collectively constituted Homes and Mandarin's contract for the purchase of the G4 joists:
• the distribution agreement between Weyerhaeuser and UFP;
• the general terms agreement between Homes and UFP;
• the addendums to the general terms agreement;
• Weyerhaeuser's stand-alone warranty for the joists;
• the invoices UFP generated each time Homes and Mandarin purchased G4 joists (the parties also refer to the invoices as purchase orders); and
• the "Terms and Conditions of the Sale" available on UFP's website and referenced in the invoices.
¶ 47 None of these documents, by itself, sets forth all the terms and conditions of Homes and Mandarin's purchase of the G4 joists. Specifically, no single document reflects the number of G4 joists Homes and Mandarin wished to order, the price of those joists, the payment terms, and the dates on which the joists would be delivered; the parties' rights, obligations, and duties; and the contractual remedy available in the event a party breached its duty.
506 P.3d 120 ¶ 48 Because these interrelated documents related to Homes and Mandarin's purchase of the G4 joists from Weyerhaeuser, we agree with Weyerhaeuser that they collectively constituted a single contract that governed the sale of the G4 joists to Homes and Mandarin. See id. (explaining that, "[i]n the context of larger construction projects," the parties "typically rely on a network of contracts to allocate their risks, duties, and remedies"); Cole v. Hotz , 758 P.2d 679, 682 (Colo. App. 1987) ("Since the agreement between the parties was contained in several documents, we must construe those documents together as though they comprise a single document."). (We henceforth refer to the network of contracts as the contract.)
2. The Date of the Contract ¶ 49 In considering the applicability of the economic loss rule, we examine whether the alleged wrongful conduct occurred before or after the parties entered into their contract. The economic loss rule does not apply to claims arising from a defendant's pre-contractual conduct because, at that time, there was no contract that could have subsumed identical tort duties. Hamon Contractors , 229 P.3d at 291, 293 ; see Van Rees v. Unleaded Software, Inc. , 2016 CO 51, ¶ 15, 373 P.3d 603, 607 (explaining that the economic loss rule does not bar claims "based on misrepresentations made prior to the formation of the contracts, which [the plaintiff] alleges induced him to enter into the contracts and therefore violated an independent duty in tort to refrain from such conduct"). In contrast, fraud occurring during the parties' performance of their contract is post-contractual and may be barred by the economic loss rule. See Hamon Contractors , 229 P.3d at 289. ¶ 50 Homes and Mandarin assert that they contracted with Weyerhaeuser (through UFP) to purchase the G4 joists after Weyerhaeuser learned that the joists were off-gassing dangerous amounts of formaldehyde and, thus, Weyerhaeuser had a pre-contractual duty not to misrepresent the condition of the joists to them. But the record reflects that the contract, and, therefore, the duties subsumed within the contract, predated Weyerhaeuser's alleged misrepresentations.
¶ 51 In their third amended complaint, Homes and Mandarin alleged that Weyerhaeuser knew about the off-gassing of formaldehyde in March 2016 and began misrepresenting the condition of the G4 joists in December 2016. But Weyerhaeuser provided Homes and Mandarin with information on the warranty for its joists in February 2015; Homes and UFP entered into the general terms agreement in March 2015; and UFP provided Homes and Mandarin with its "Terms and Conditions of Sale" each time they purchased Weyerhaeuser's joists, including when they purchased G2 joists in 2015 and 2016. Thus, Homes and Mandarin's purchase of G4 joists was subject to the pre-existing contract.
¶ 52 Because any negligent or fraudulent misrepresentations that Weyerhaeuser may have made to Homes and Mandarin concerning the G4 joists were post-contractual, we proceed with our analysis of the economic loss rule. See id.
3. The Duties that Weyerhaeuser Owed Homes and Mandarin
¶ 53 We now determine whether Weyerhaeuser owed Homes and Mandarin an independent common law duty of care by considering whether (1) the relief Homes and Mandarin seek in tort is the same as the contractual relief they seek; (2) a recognized common law duty of care supports Homes and Mandarin's claims; and (3) the tort duty that Weyerhaeuser allegedly breached differs from the contractual duty that Weyerhaeuser owed Homes and Mandarin. See id. at 293.
a. The Relief Homes and Mandarin Sought in Contract and in Tort ¶ 54 The parties agree that the relief Homes and Mandarin seek under tort law is identical to the relief they seek under contract law — damages for economic losses. Throughout this litigation, Homes and Mandarin sought to recover damages for seven categories of economic losses: remediation costs, the discount required to sell remediated 506 P.3d 121 houses, lost vertical financing capacity, increased management overhead, loss of joint venture financing partners, erosion of brand equity value, and attorney fees. These are consequential damages. See Johnson Nathan Strohe, P.C. v. MEP Eng'g, Inc. , 2021 COA 125, ¶ 16, 501 P.3d 826, 830 (" ‘Consequential damages’ is a legal term of art that describes ‘[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act.’ " (quoting Black's Law Dictionary 489 (11th ed. 2019))). Consequential damages are equally recoverable in contract and tort claims. See, e.g. , Vanderbeek v. Vernon Corp. , 50 P.3d 866, 869-71 (Colo. 2002) ; Engeman Enters., LLC v. Tolin Mech. Sys. Co. , 2013 COA 34, ¶ 15, 320 P.3d 364, 368.
¶ 55 Significantly, Homes and Mandarin sought identical consequential damages through their contract claims — breach of express warranty and breach of implied warranty of merchantability — and through their negligence, negligent misrepresentation, and fraudulent concealment claims, which sound in tort. (The parties agree that Weyerhaeuser fully complied with the terms and conditions of the warranty it provided to Homes and Mandarin. Thus, under contract law, Homes and Mandarin received the benefit of their bargain with Weyerhaeuser. See infra Part III.B.3.)
¶ 56 Thus, the first Hamon Contractors factor "weighs in favor of applying the economic loss rule." Top Rail Ranch Ests., LLC v. Walker , 2014 COA 9, ¶ 35, 327 P.3d 321, 329 ; see Town of Alma , 10 P.3d at 1262-63 ("The phrase ‘economic loss rule’ necessarily implies that the focus of the inquiry under its analysis is on the type of damages suffered by the aggrieved party.") (footnote omitted).
b. The Common Law Duties of Care Weyerhaeuser Owed to Homes and Mandarin ¶ 57 Turning to the second factor, Homes and Mandarin contend that Weyerhaeuser owed them, as purchasers of Weyerhaeuser's joists, three common law duties independent from any contractual duties: "(1) to not engage in fraud or negligent misrepresentation that induces a plaintiff to enter into a damaging transaction; (2) to disclose known but latent defects; and (3) to act reasonably in the design, manufacture, and sale of products." "The existence and scope of a tort duty is a question of law to be determined by the court." A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc. , 114 P.3d 862, 866 (Colo. 2005). ¶ 58 We agree with Homes and Mandarin that Weyerhaeuser owed them at least two common law duties: (1) not to engage in pre-contractual fraud or make material misrepresentations, see Van Rees , ¶ 15, 373 P.3d at 607 (explaining that the economic loss rule does not bar claims "based on misrepresentations made prior to the formation of the contracts, which [the plaintiff] alleges induced him to enter into the contracts and therefore violated an independent duty in tort to refrain from such conduct"); and (2) to act reasonably in the design, manufacture, and sale of its products, see Halliburton v. Pub. Serv. Co. , 804 P.2d 213, 216-17 (Colo. App. 1990) ("[T]he principles of general product liability law impose a duty on the manufacturer of a product to act reasonably in the design, manufacture, and sale of the product."). ¶ 59 But we conclude that Weyerhaeuser did not owe Homes or Mandarin a duty to disclose latent defects in the G4 joists because Homes and Mandarin were not subsequent homeowners, like the plaintiffs in Cosmopolitan Homes, Inc. v. Weller , 663 P.2d 1041, 1043-44 (Colo. 1983), who were unable to discover latent defects in the components of their house. See S K Peightal Eng'rs, LTD v. Mid Valley Real Est. Sols. V, LLC , 2015 CO 7, ¶ 24, 342 P.3d 868, 876 (explaining that construction professionals owe an independent common law duty to subsequent individual homeowners "such that homeowners can typically sue in tort for negligent construction," even when an identical duty is included in the parties' contract). We are aware of no Colorado authority extending the duty to disclose defects in construction materials to cases involving a sophisticated buyer of those materials that had a contractual remedy for defects in the materials, or a sophisticated buyer of a house that owned the house only briefly before selling it 506 P.3d 122 to the ultimate buyer, and, as here, acknowledged in its contract that it did not have the right to recover the very type of damages it later sought through its tort claims.
¶ 60 Because Weyerhaeuser owed Homes and Mandarin at least two recognized common law duties, "the second ... factor weighs in favor of finding an independent duty of care." Engeman Enters. , ¶ 18, 320 P.3d at 369.
c. Whether Weyerhaeuser's Tort Duties Differed from Its Contractual Duties
¶ 61 To determine whether Weyerhaeuser owed Homes and Mandarin independent tort duties, we must compare the tort duties and the contractual duties that Weyerhaeuser owed to them. See S K Peightal Eng'rs , ¶ 20, 342 P.3d at 875 ("[A]ny general tort duty is independent of contractual duties if the contract contains no duties or the allegedly breached tort duty is beyond the scope of the duties contained within the contract at issue."). We consider separately the duty that Homes and Mandarin contend supports their fraud and negligent misrepresentation claims (the duty to "not engage in fraud or negligent misrepresentation that induces a plaintiff to enter into a damaging transaction") and the duty underlying their negligence claims not involving misrepresentation (the duty to "act reasonably in the design, manufacture, and sale of products").
¶ 62 The Colorado courts have held that the economic loss rule may preclude claims for negligence and intentional torts. Our supreme court has applied the rule to "bar common law tort claims of negligence or negligent misrepresentation." Bermel , ¶ 21, 440 P.3d at 1155. Divisions of this court have applied the rule to bar claims for fraud and other intentional torts when the claims did not arise from a common law duty that differed from the express or implied contractual duty that the defendant owed to the plaintiff. See Top Rail , ¶¶ 29, 38, 327 P.3d at 328, 329 (applying the economic loss rule to bar fraudulent concealment, intentional misrepresentation, and negligent misrepresentation claims); Former TCHR, LLC v. First Hand Mgmt. LLC , 2012 COA 129, ¶¶ 20, 33, 317 P.3d 1226, 1231, 1233 (barring fraudulent misrepresentation and fraudulent concealment claims under the economic loss rule); Hamon Contractors , 229 P.3d at 289 (holding that the economic loss rule barred the plaintiff's fraudulent concealment and fraudulent misrepresentation claims).
¶ 63 Dicta in Bermel and McWhinney Centerra Lifestyle Center LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC , 2021 COA 2, 486 P.3d 439, suggests that the economic loss rule has only limited applicability to intentional tort claims. See Bermel , ¶ 20 n.6, 440 P.3d at 1154 n.6 ("[T]he economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation."); McWhinney , ¶ 67, 486 P.3d at 453 ("[I]n most instances the economic loss rule will not bar intentional tort claims."). But no Colorado case has held that the economic loss rule can never apply to claims for fraud or other intentional torts. As Hamon Contractors explains,
[t]he [ Town of Alma ] court ... did not draw any bright lines among types of torts (e.g., fraud, negligence) that are always barred by the economic loss rule, those that may be barred, and those that are never barred. Rather, the court merely pointed by way of example to cases which, under their particular facts, involved independent tort duties. With respect to fraud specifically, the two cases cited by the court ... did not involve claims of fraud in the performance of a contract. 229 P.3d at 291 (first citing Brody v. Bock , 897 P.2d 769, 772, 776 (Colo. 1995) ; and then Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc. , 960 S.W.2d 41, 43-44, 46 (Tex. 1998) ).
¶ 64 This is one of those cases in which the economic loss rule bars fraud claims, particularly because Homes and Mandarin received the full benefit of their bargain documented in the contract and because they seek to recover through their tort claims the very type of damages expressly excluded under the warranty they received from Weyerhaeuser.
506 P.3d 123 i. The Duty Underlying Homes and Mandarin's Fraud and Negligent Misrepresentation Claims ¶ 65 While we agree with Homes and Mandarin that Weyerhaeuser owed them a duty to not make pre-contractual negligent or fraudulent misrepresentations, we conclude that this duty is not applicable here because Weyerhaeuser's alleged conduct occurred after the parties entered into the contract. See supra Part II.C.2. ¶ 66 To the extent that Weyerhaeuser owed Homes and Mandarin a duty to not make misrepresentations or engage in fraud after they entered into the contract, such duty was subsumed within the contract through the implied duty of good faith and fair dealing. See § 4-1-304, C.R.S. 2021 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement."); Cary v. United of Omaha Life Ins. Co. , 68 P.3d 462, 466 (Colo. 2003) ("Every contract in Colorado contains an implied duty of good faith and fair dealing."). The duty of good faith and fair dealing applies "when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." Amoco Oil Co. v. Ervin , 908 P.2d 493, 498 (Colo. 1995). A party breaches the implied duty of good faith and fair dealing by using the "discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract." McDonald v. Zions First Nat'l Bank, N.A. , 2015 COA 29, ¶ 69, 348 P.3d 957, 967 (quoting Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc. , 872 P.2d 1359, 1363 (Colo. App. 1994) ).
¶ 67 The contract incorporated the implied duty of good faith and fair dealing because Weyerhaeuser had the discretion to modify the design and construction of its joists without Homes and Mandarin's prior knowledge or consent. Homes and Mandarin's orders for the G4 joists did not contain specifications for the joists and, significantly, did not require that the fire-resistant coating of the G4 joists consist of a specific material. Rather, Homes and Mandarin merely ordered "14 [inch] Trusjoist [sic] Timberstrand[s]." ("Trus Joist" is a registered trademark of Weyerhaeuser.) They relied on Weyerhaeuser's discretion to design and manufacture the joists without defects. See id. at ¶ 67, 348 P.3d at 967 ("Discretion in performance occurs ‘when the parties, at formation [of the contract], defer a decision regarding performance terms of the contract’ leaving one party with the power to set or control the terms of performance after formation.") (alteration in original) (quoting City of Golden v. Parker , 138 P.3d 285, 292 (Colo. 2006) ).
¶ 68 Because the contract incorporated the implied duty of good faith and fair dealing, Weyerhaeuser owed Homes and Mandarin a contractual duty to be "honest[ ] in fact and [to] observ[e] ... reasonable commercial standards of fair dealing in the trade." Restatement (Second) of Contracts § 205 cmt. a (Am. L. Inst. 1981). Further, the implied duty of good faith and fair dealing required Weyerhaeuser to "effectuate the intentions of the parties or to honor their reasonable expectations." Amoco Oil , 908 P.2d at 498. Thus, Weyerhaeuser owed a contractual duty to Homes and Mandarin not to misrepresent the quality and safety of the G4 joists. See Hamon Contractors , 229 P.3d at 292-93 (holding that the implied covenant of good faith and fair dealing precluded the defendant from misrepresenting the cause of the delays that impacted the plaintiff's performance under the parties' contract).
¶ 69 For these reasons, Weyerhaeuser owed Homes and Mandarin concurrent contractual and tort duties not to engage in fraud or to misrepresent the condition and safety of its joists. Because the duties overlapped, under the economic loss rule, a breach of the duties supported a claim for breach of contract but not a tort claim. See id. at 293 (holding that the implied covenant of good faith and fair dealing subsumed the plaintiff's fraud claim); Top Rail , ¶ 38, 327 P.3d at 329 ("[T]he implied covenant of good faith and fair dealing, which exists in every contract, may bar identical fraud claims under the economic loss rule.").
506 P.3d 124 ii. The Duty Supporting Homes and Mandarin's Other Negligence Claims ¶ 70 The same analysis applies to Homes and Mandarin's other negligence claims. The implied covenant of good faith and fair dealing subsumed those claims because it limited Weyerhaeuser's discretion to modify its joists to only those changes that complied with industry safety standards. See Restatement (Second) of Contracts § 205 cmt. a (providing that "good faith" requires "the observance of reasonable commercial standards"). The implied covenant of good faith and fair dealing also required Weyerhaeuser to effectuate the parties' intentions in entering into the contract by ensuring its joists were free from defects and by not making knowingly false statements about the condition of the joists. See Amoco Oil , 908 P.2d at 498.
¶ 71 Moreover, the contract expressly required Weyerhaeuser to act reasonably in designing and manufacturing its joists.
• The distribution agreement stated that Weyerhaeuser's products "are warranted to be of merchantable quality and to conform to specifications and tolerances provided in the applicable industry standards, or Weyerhaeuser's published standards, or otherwise incorporated in this agreement."
• The distribution agreement further provided that Weyerhaeuser "warrants that its products will be free from manufacturing errors or defects in workmanship and material ... [and] warrants the adequacy of its design for the normal and expected life of the building."
• The "Controlling Terms" of the distribution agreement provided that "[t]he terms and conditions of this [a]greement ... will apply to each order accepted or shipped by Weyerhaeuser."
• Weyerhaeuser's standard terms of sales stated that "[p]roducts manufactured by Weyerhaeuser are warranted to be of merchantable quality and to conform to the specifications and tolerances provided in this [a]greement if specified, alternatively in Weyerhaeuser's published standards for such products, if any, alternatively in applicable industry standards."
• Weyerhaeuser's stand-alone warranty for its joists provided that "[f]or delamination, strand[,] or component separation, inadequacy of design values (as published)[,] or manufacturing defect ... [,] Weyerhaeuser will pay reasonable cost of labor and material for the repair or replacement of the covered [j]oists, not to exceed 3 times the original purchase price of the [j]oist."
¶ 72 Because the contract memorialized the duty of care Weyerhaeuser owed to Homes and Mandarin to act reasonably in the design and manufacture of its joists, Homes and Mandarin have not established that Weyerhaeuser owed them a common law duty independent of the contractual duty Weyerhaeuser owed to them. Thus, the economic loss rule bars Homes and Mandarin's negligence claims and "holds the parties to the contract['s] terms." See BRW , 99 P.3d at 74.
¶ 73 For these reasons, we hold that the third Hamon Contractors factor weighs in favor of applying the economic loss rule here. See Top Rail , ¶ 37, 327 P.3d at 329.
¶ 74 Considering the three factors together, we conclude that Weyerhaeuser did not owe Homes and Mandarin a duty independent of the duties arising from the contract, particularly in light of the warranty that Homes and Mandarin received from Weyerhaeuser. See id. at ¶ 39, 327 P.3d at 329 ; Hamon Contractors , 229 P.3d at 294-95 ; Engeman Enters. , ¶ 29, 320 P.3d at 370.
4. Under the Economic Loss Rule, a Plaintiff May Not Assert Tort Claims to Recover Damages Expressly Excluded Under Its Contract ¶ 75 Homes and Mandarin's tort claims additionally fail because they may not recover under a tort theory damages expressly excluded under the contract. See Severn Peanut Co. v. Indus. Fumigant Co. , 807 F.3d 88, 94 (4th Cir. 2015) (The plaintiff could not recover damages under a negligence claim because it "chose to bargain 506 P.3d 125 away protection for the consequential damages caused by breach of [a contractual] duty. Its negligence claims therefore attempt to undo that bargain through the vehicle of tort law."); Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc. , 148 Wis.2d 910, 437 N.W.2d 213, 217-18 (1989) ("[A] commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly, as here, where the warranty given by the manufacturer specifically precludes the recovery of such damages."). The logic of these cases applies to fraud and negligence claims alike.
¶ 76 Here, the distribution agreement between Weyerhaeuser and UFP expressly barred purchasers of Weyerhaeuser's joists from recovering certain categories of damages:
IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR PROCEDURAL COSTS, LOSS OF PROFITS, LOSS OF USE, OR FOR ANY OTHER INCIDENTAL, CONSEQUENTIAL, INDIRECT[,] OR SPECIAL DAMAGES OR FOR CONTRIBUTION OR INDEMNITY CLAIMS, HOWEVER CAUSED, WHETHER OR NOT THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTIES' LIABILITY TO THE OTHER SHALL BE LIMITED TO ACTUAL DIRECT DAMAGES. THESE LIMITATIONS WILL APPLY TO ALL CLAIMS, INCLUDING WITHOUT LIMITATION, WARRANTY, CONTRACT, INDEMNITY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY[,] OR OTHERWISE.
¶ 77 Although Homes and Mandarin were not parties to the distribution agreement, they are nonetheless bound by its limitation of liability language. See § 4-2-318, C.R.S. 2021 (providing that a seller's warranty "extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty"); Wenner Petroleum Corp. v. Mitsui & Co. (U.S.A.), Inc. , 748 P.2d 356, 357 (Colo. App. 1987) (noting that section 4-2-318 "provides that properly executed limitations of warranties or available remedies are equally applicable to any one that would be a beneficiary of a seller's warranty"); see also BRW , 99 P.3d at 72-73 (holding that, in cases involving the application of the economic loss doctrine to a "network of contracts" in the construction industry, "[t]he policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship"). And comment 1 to section 4-2-318 states, "[t]o the extent that the contract of sale contains provisions under which warranties are excluded or modified, or remedies for breach are limited, such provisions are equally operative against beneficiaries of warranties under this section."
¶ 78 Weyerhaeuser's online standard terms of sales similarly stated that Weyerhaeuser "shall not be liable for consequential, indirect[,] or incidental damages, or for an amount in excess of the price for the shipment involved, under the foregoing warranty or any other part of this agreement."
¶ 79 Moreover, the stand-alone warranty that Weyerhaeuser provided to Homes and Mandarin also limited its liability:
Weyerhaeuser will pay reasonable cost of labor and material for the repair or replacement of the covered [j]oists, not to exceed 3 times the original purchase price of the [j]oist.
....
Weyerhaeuser's sole responsibility is as set forth in this warranty and Weyerhaeuser will not be responsible for incidental, indirect, or consequential damages. ¶ 80 These provisions all barred Homes and Mandarin from recovering the very category of damages — consequential damages — they seek to recover through their tort claims. Sophisticated commercial entities such as Homes and Mandarin may not circumvent the exclusion of damages in their contracts by cloaking their claims in tort theories. See Wenner Petroleum , 748 P.2d at 357 (explaining that the parties "are all sophisticated merchants, and this court will not interfere with their bargained-for sales agreements").
506 P.3d 126 ¶ 81 Not allowing Homes and Mandarin to recover damages expressly excluded in the contract furthers the rationale of the economic loss rule that contracting parties "are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective." Indem. Ins. Co. v. Am. Eurocopter LLC , No. 03CV949, 2005 WL 1610653, at *10 (M.D.N.C. July 8, 2005) (citation omitted); see Ravenstar, LLC v. One Ski Hill Place, LLC , 2017 CO 83, ¶ 13, 401 P.3d 552, 555 ("[A]n essential corollary of the concept of bargained-for duties is bargained-for liabilities for failure to perform them. Important to the vitality of contract is the capacity voluntarily to define the consequences of the breach of a duty before assuming the duty." (quoting Isler v. Tex. Oil & Gas Corp. , 749 F.2d 22, 23 (10th Cir. 1984) )).
¶ 82 Homes and Mandarin's attempt to recover through their tort claims the very damages excluded under the contract underscores why this case is distinguishable from Bermel and McWhinney , neither of which involved an attempt to avoid the application of unfavorable contractual language. See Bermel , ¶¶ 4-9, 440 P.3d at 1152 ; McWhinney , ¶¶ 3-9, 486 P.3d at 444-45.
¶ 83 For these reasons, we conclude that the economic loss rule bars Homes and Mandarin's negligence, negligent misrepresentation, and fraudulent concealment claims. In light of this determination, we need not address Weyerhaeuser's remaining arguments.
III. Homes and Mandarin's Cross-Appeal
¶ 84 We next consider Homes and Mandarin's cross-appeal, in which they contend that (1) if the economic loss rule applies, the trial court erred by directing a verdict in favor of Weyerhaeuser on their warranty claims; and (2) the trial court erred by denying their motion for judgment notwithstanding the verdict on their CCPA claim.
A. Jurisdiction
¶ 85 As an initial matter, Weyerhaeuser argues that, because Homes and Mandarin filed their notice of cross-appeal prematurely, this court lacks jurisdiction over the cross-appeal. We disagree.
1. Additional Facts ¶ 86 On November 18, 2019, the trial court entered judgment on the jury verdict and denied the parties' post-trial motions.
¶ 87 Weyerhaeuser filed its first notice of appeal on January 2, 2020. In the notice of appeal, Weyerhaeuser appealed the trial court's November 18, 2019, orders entering judgment on the jury verdict and denying its motion for judgment notwithstanding the verdict. Homes and Mandarin filed their notice of cross-appeal thirteen days later.
¶ 88 In their notice of cross-appeal, Homes and Mandarin appealed the trial court's "judgment entered on the jury verdict against Weyerhaeuser[;] ... interlocutory orders merged into the final judgment, including the [trial] court's order on directed verdict" dismissing their warranty claims; and the order denying their motion for judgment notwithstanding the verdict" on their CCPA claim.
¶ 89 After Homes and Mandarin filed their notice of cross-appeal, on February 21, 2020, the trial court entered judgment in favor of Homes and Mandarin on Weyerhaeuser's unjust enrichment counterclaim. (As noted supra Part I.D, the trial court had taken such counterclaim under advisement after entering judgment on the jury verdict.)
¶ 90 In its second notice of appeal, filed on March 6, 2020, Weyerhaeuser appealed the trial court's February 21, 2020, order, as well as the November 18, 2019, orders. Weyerhaeuser also filed a motion to consolidate the two appeals.
¶ 91 On March 31, 2020, this court denied Weyerhaeuser's motion to consolidate the appeals and noted that its first appeal "appear[ed] to have been taken prematurely" from the order entering judgment on the jury's verdict. This court held that such order "was not final because it did not resolve [Weyerhaeuser's] counterclaim for unjust enrichment and was never certified pursuant to C.R.C.P. 54(b)." But, in light of Weyerhaeuser's filing of its second notice of appeal, this court determined that the first appeal was a "perfected appeal from a final judgment," 506 P.3d 127 ordered that all filings in the second appeal "be removed" to the first appeal, and closed the second appeal.
2. This Court Has Jurisdiction Over Homes and Mandarin's Cross-Appeal
¶ 92 Weyerhaeuser's jurisdictional argument disregards this court's March 31 order. By stating that all filings in the second appeal were "removed" to the first appeal, the order effectively held that this court would consider Homes and Mandarin's cross-appeal as part of the first appeal. This court's determination that the first appeal had been perfected meant that the cross-appeal was likewise perfected.
¶ 93 We therefore conclude that this court has jurisdiction over Homes and Mandarin's cross-appeal and review it on the merits.
B. Homes and Mandarin's Warranty Claims
¶ 94 Homes and Mandarin assert that, if this court were to determine that the economic loss rule applied to their negligence, negligent misrepresentation, and fraudulent concealment claims, then we must reverse the trial court's order directing a verdict in favor of Weyerhaeuser on their warranty claims. We disagree.
1. Additional Facts
¶ 95 Homes and Mandarin's third amended complaint included claims for breach of express warranty and breach of the implied warranty of merchantability. In their warranty claims, Homes and Mandarin asserted that
Weyerhaeuser's purported limitation of remedies fails of its essential purpose in that: (1) it limits recovery to a multiple of the purchase price of the [j]oists themselves, or to their repair and replacement, when the damages arising from installation of the [j]oists far exceed the limited amount; and (2) the [j]oists contained a latent defect not discoverable upon reasonable inspection.
To the extent that Weyerhaeuser's warranty purports to limit or eliminate certain contractual rights afforded to Dream Finders, such limitations are unenforceable.
¶ 96 At the close of Homes and Mandarin's evidence, Weyerhaeuser moved for a directed verdict under C.R.C.P. 50 on the nine claims Homes and Mandarin tried to the jury, including their claims for breach of warranty. Weyerhaeuser argued it had not breached the warranty it provided to Homes and Mandarin because the evidence showed that Weyerhaeuser had fully complied with the terms and conditions of the warranty.
¶ 97 Homes and Mandarin responded that, while they did not dispute that Weyerhaeuser had remediated the G4 joists, they nonetheless incurred substantial damages as a consequence of the defects in the joists and that Weyerhaeuser had not reimbursed them for such damages. Based on these alleged damages, Homes and Mandarin asserted that their remedy set forth in the warranty they received from Weyerhaeuser failed its essential purpose and was invalid.
¶ 98 The trial court agreed with Weyerhaeuser:
[The] express[ ] warranty is clear in terms of what it warrants and what the remedy is for that. And I think the evidence is crystal clear that, to the extent that the product was not warranted, the remedy that was provided for by the warranty was fulfilled. And the Plaintiff was not out of pocket for that.
....
I'm not convinced that there's a jury question with respect to whether there's been a breach of warranty, and whether all these other damages, as a spinoff from this warranty claim are recoverable under a warranty theory.
....
This is a case where a manufacturer manufactured a product, they were distributed through distributors, and Plaintiff purchased it through their means, and there is an issue with respect to it that was remediated and was fixed.
The trial court entered a directed verdict in favor of Weyerhaeuser on the warranty claims.
506 P.3d 128 2. Standard of Review ¶ 99 We review a trial court's ruling on a motion for directed verdict de novo. State Farm Mut. Auto. Ins. Co. v. Goddard , 2021 COA 15, ¶ 26, 484 P.3d 765, 771. "We view the evidence, and all inferences that may reasonably be drawn therefrom, in the light most favorable to the nonmoving party." Parks v. Edward Dale Parrish LLC , 2019 COA 19, ¶ 10, 452 P.3d 141, 144.
3. Homes and Mandarin Received the Remedy Specified in the Warranty ¶ 100 Relying on Cooley v. Big Horn Harvestore Systems, Inc. , 813 P.2d 736 (Colo. 1991), and Fiberglass Component Production, Inc. v. Reichhold Chemicals, Inc. , 983 F. Supp. 948 (D. Colo. 1997), Homes and Mandarin argue that the warranty they received from Weyerhaeuser failed in its essential purpose because Homes and Mandarin suffered "substantial consequential losses" as a result of Weyerhaeuser's knowing concealment of the latent defects in the G4 joists. Cooley and Fiberglass , however, are distinguishable.
¶ 101 In Cooley , the warranty promised "repair or replacement of any defective product or part thereof. The evidence established that the product was defective and was not repaired or replaced with a non-defective product." 813 P.2d at 745. Here, the parties do not dispute that Weyerhaeuser paid to repair the G4 joists in the houses that Homes and Mandarin built.
¶ 102 Homes and Mandarin's reliance on Fiberglass is also misplaced. In Fiberglass , the plaintiff manufactured air conditioning housings containing a defective resin. 983 F. Supp. at 952. The resin manufacturer's standard terms and conditions of sale and product bulletin expressly limited the buyer's remedy to replacement of the resin. Id. at 958. The remedy did not include the plaintiff's cost of recalling and retrofitting the air conditioning units that incorporated housings containing the defective resin. Id. at 960.
¶ 103 The plaintiff argued that the contractual remedy for defects in the resin failed in its essential purpose because it did not require the resin manufacturer to reimburse the plaintiff for the more than $1.2 million cost of recalling and retrofitting the affected air conditioning units. Id. at 959-60. The court concluded that, because the cost of the resin "represent[ed] a minute fraction of the total cost of the recall and retro fit," limiting the plaintiff's damages to the cost of the resin would "deprive [the plaintiff] of the benefits of its bargain." Id. at 960. Therefore, a jury could find that the contractual limitation on damages failed the remedy's essential purpose. Id.
¶ 104 In contrast, Weyerhaeuser fully remediated the G4 joists at its own expense. Following the remediation work, neither the joists nor the houses built with the G4 joists were subject to the risk of excessive levels of formaldehyde emissions. Moreover, although Weyerhaeuser's warranty said it would only "pay reasonable costs of labor and material for the repair or replacement of the covered [j]oists, not to exceed 3 times the original purchase price of the [j]oist," Weyerhaeuser spent more than three times the original purchase price of the joists to remediate them.
¶ 105 Thus, there is no evidence that Homes and Mandarin failed to receive the value of their bargain with Weyerhaeuser. See id. ("Failure of the essential purpose of a remedy is measured by whether the buyer is deprived of the substantial value of his bargain."). We therefore conclude that the trial court did not err by granting Weyerhaeuser's directed verdict on Homes and Mandarin's warranty claims.
C. Homes and Mandarin's CCPA Claim
¶ 106 Homes and Mandarin assert that the trial court erred by denying their motion for judgment notwithstanding the verdict on their CCPA claim. We conclude that, although the economic loss rule does not bar Homes and Mandarin's CCPA claim, the trial court did not err by denying the motion. And, in light of this holding, we reject Homes and Mandarin's request for an award of attorney fees under the CCPA.
506 P.3d 129 1. The Economic Loss Rule Does Not Bar Homes and Mandarin's CCPA Claim
¶ 107 In analyzing whether the trial court erred by denying Homes and Mandarin's motion for judgment notwithstanding the verdict on their CCPA claim, we must first determine whether the economic loss rule bars the claim. ¶ 108 Our supreme court has explained that the judge-made economic loss rule does not apply to statutory causes of action. Bermel , ¶¶ 21-22, 34, 43, 440 P.3d at 1155, 1157, 1158. As the Bermel court noted, "to limit or abrogate a clear legislative pronouncement by reason of ... judicial policy concerns would offend the separation of powers." Id. at ¶ 37, 440 P.3d at 1157. Thus, because the CCPA provides a statutory cause of action, see § 6-1-113(1), C.R.S. 2021, the economic loss rule does not bar Homes and Mandarin's CCPA claim under the reasoning of Bermel .
2. Applicable Law
¶ 109 A trial court may grant a motion for judgment notwithstanding the verdict on either of the following grounds: "(1) Insufficiency of evidence as a matter of law; or (2) No genuine issue as to any material fact and the moving party being entitled to judgment as a matter of law." C.R.C.P. 59(e).
3. Standard of Review
¶ 110 The parties disagree on the standard applicable to our review of the trial court's ruling on Homes and Mandarin's motion for judgment notwithstanding the verdict. Homes and Mandarin contend that de novo review applies. Weyerhaeuser asserts that the standard of review is sufficiency of the evidence because Homes and Mandarin ask us to review the jury's verdict on their CCPA claim based on the facts presented at trial. ¶ 111 The resolution of the parties' disagreement hinges on whether the facts underlying the motion for judgment notwithstanding the verdict were disputed. Our review is de novo if "there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Cardenas v. Fin. Indem. Co. , 254 P.3d 1164, 1167 (Colo. App. 2011) (citing C.R.C.P. 59(e)(2) ). But "where the factual basis for the verdict must be analyzed, we review the record in favor of the nonmoving party." Durdin v. Cheyenne Mountain Bank , 98 P.3d 899, 903 (Colo. App. 2004). During such review, we take the evidence "in the light most favorable to the party opposing the motion and draw[ ] every reasonable inference which may legitimately be drawn from the evidence in favor of that party." Id. ¶ 112 The parties dispute whether Homes and Mandarin sufficiently proved each element of their CCPA claim. Because we must analyze the facts underlying the jury's verdict on the CCPA claim, we review the record in the light most favorable to Weyerhaeuser. Id.
4. The Evidence Introduced at Trial Supports the Trial Court's Denial of Homes and Mandarin's Motion for Judgment Notwithstanding the Verdict ¶ 113 A plaintiff must establish five elements to prevail on a CCPA claim:
(1) that the defendant engaged in an unfair or deceptive trade practice;
(2) that the challenged practice occurred in the course of [the] defendant's business ...;
(3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
(4) that the plaintiff suffered injury in fact to a legally protected interest; and
(5) that the challenged practice caused the plaintiff's injury. Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc. , 62 P.3d 142, 146-47 (Colo. 2003) (quoting Hall v. Walter , 969 P.2d 224, 235 (Colo. 1998) ).
¶ 114 Because the parties did not request a verdict form requiring the jury to make findings on each element of Homes and Mandarin's CCPA claim, we are unable to ascertain which of the five elements, or which combination of elements, the jury found wanting. Homes and Mandarin's CCPA claim necessarily failed in the absence of evidence supporting any one of the five elements. See 506 P.3d 130 Martinez v. Lewis , 969 P.2d 213, 223 (Colo. 1998) (explaining that when a plaintiff "fails to establish [an] element" in a CCPA claim, appellate courts need not consider the remaining elements). Thus, if Homes and Mandarin failed to prove one or more of those elements, the trial court did not err by denying their motion for judgment notwithstanding the verdict.
¶ 115 We focus on the public impact element of a CCPA claim. (Although, in its response to Homes and Mandarin's motion, Weyerhaeuser asserted that Homes and Mandarin failed to prove each of the five elements, Weyerhaeuser emphasized the public impact and deceptive trade practice elements.)
¶ 116 Homes and Mandarin argued in the trial court that they established public impact through evidence that the defective G4 joists negatively impacted more than 800 Colorado consumers, including home builders, contractors, sales agents, other employees of companies working on houses in which the G4 joists were installed, homeowners, and the homeowners' families and pets. We disagree. ¶ 117 When analyzing whether a challenged practice "significantly impacts the public," id. at 221, we consider "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future," Rhino Linings , 62 P.3d at 149 (emphasis added). We are mindful that "[t]he purpose of the CCPA is to provide ‘consumers who are in a position of relative bargaining weakness with protection against a range of deceptive trade practices.’ " Curragh Queensl. Mining Ltd. v. Dresser Indus., Inc. , 55 P.3d 235, 240 (Colo. App. 2002) (quoting Martinez , 969 P.2d at 222 ). ¶ 118 Viewing the evidence in the light most favorable to Weyerhaeuser, we conclude that it supports a reasonable jury's verdict in favor of Weyerhaeuser on the CCPA claim. Stated differently, Homes and Mandarin did not prove that the evidence, taken in the light most favorable to Weyerhaeuser and drawing every reasonable inference which may legitimately be derived from the evidence in favor of Weyerhaeuser, would not support a verdict by a reasonable jury in favor of Weyerhaeuser. See id. The evidence would support a finding that Homes and Mandarin failed to prove that Weyerhaeuser's alleged misrepresentations significantly impacted the public. ¶ 119 First, we reject Homes and Mandarin's assertion that Weyerhaeuser's alleged misrepresentations directly affected more than 800 consumers. While Weyerhaeuser's remediation of the defective G4 joists impacted the individuals who purchased houses from Homes or Mandarin, the CCPA does not provide a remedy for every downstream market impact stemming from a private transaction. See NetQuote, Inc. v. Byrd , 504 F. Supp. 2d 1126, 1137 (D. Colo. 2007) (holding that any ensuing impact on potential consumers of the defendants' services was "indirect at best"); Martinez , 969 P.2d at 222 (holding that there was no significant public impact when a doctor who performed an independent medical examination of the plaintiff allegedly misrepresented his qualifications to the plaintiff's insurance company).
¶ 120 Rather, because the CCPA was "clearly enacted to control various deceptive trade practices in dealing with the public ," Hall , 969 P.2d at 234 (alteration in original) (quoting People ex rel. Dunbar v. Gym of Am., Inc. , 177 Colo. 97, 107, 493 P.2d 660, 665 (1972) ), we look to the persons with whom Weyerhaeuser sought to enter into transactions to determine the appropriate consumer, see, e.g. , Loughridge v. Goodyear Tire & Rubber Co. , 192 F. Supp. 2d 1175, 1186-87 (D. Colo. 2002) (holding that home buyers were the appropriate consumer for the CCPA analysis because the defendant directed its marketing and website at home buyers, among other potential purchasers).
¶ 121 The record reflects that Weyerhaeuser marketed and advertised the G4 joists exclusively to home builders, and not to the ultimate individual home buyers or other members of the public. Weyerhaeuser did not direct any misrepresentations to the market generally. This alone dooms Homes 506 P.3d 131 and Mandarin's CCPA claim. See id. at 1185-86 (holding that "a large number of consumers in Colorado were directly affected by the challenged practice" in part because the defendant's marketing and website "were targeted to the ultimate consumer"); Hall , 969 P.2d at 235 (holding that the defendant's "deceptive [trade] practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers"); see also Curragh Queensl. Mining , 55 P.3d at 241 (holding that the defendant's alleged misrepresentations did not significantly impact the public because, despite advertising to more than 3,000 companies, only a few of those companies could have purchased its product).
¶ 122 Second, Homes and Mandarin are not the type of "consumer[s] contemplated by the CCPA." Martinez , 969 P.2d at 222. Unlike individual "consumers who are in a position of relative bargaining weakness ... [because they] do not have and cannot reasonably gain access to truthful information relevant to a contemplated transaction unless it comes from the person offering the good, service, or property," Homes and Mandarin are sophisticated businesses with experience and expertise in building and selling houses. Id. ; see Curragh Queensl. Mining , 55 P.3d at 241 (holding that the plaintiff failed to prove a significant public impact because, in part, it "was neither economically vulnerable nor unsophisticated in matters pertaining to" the contemplated transaction).
¶ 123 Homes and Mandarin did not seek to recover any damages that the 800 consumers allegedly incurred. To the contrary, Homes and Mandarin sought to recover their own lost profits and other damages allegedly attributable to the delay in their ability to sell houses as a consequence of the need to remediate the G4 joists. ¶ 124 Further, Homes and Mandarin failed to establish that Weyerhaeuser did not make any of the allegedly affected individual consumers whole. Rather, the evidence showed that Weyerhaeuser paid the individual home buyers' living expenses while their houses were being remediated. A sophisticated purchaser may not cloak its claim in CCPA garb by pointing to alleged harm to consumers where the purchaser does not seek to recover any damages on behalf of those consumers.
¶ 125 Because the purchasers of the G4 joists were sophisticated home builders, and because Homes and Mandarin failed to present evidence regarding the sophistication, resources, and representation status of any other person allegedly injured as a consequence of Weyerhaeuser's alleged misrepresentations, this factor weighs heavily in favor of the conclusion that the alleged misrepresentations did not have a significant public impact. See Colo. Coffee Bean, LLC v. Peaberry Coffee Inc. , 251 P.3d 9, 26 (Colo. App. 2010) (holding that the second factor implicating the consumer's sophistication was not established when the plaintiff failed to present evidence that its customer was sophisticated).
¶ 126 Third, as noted above, Weyerhaeuser's alleged misrepresentations did not directly or indirectly impact more than 800 Colorado consumers. And the misrepresentations do not have the potential to impact any person in the future. The undisputed evidence at trial showed that Weyerhaeuser voluntarily ceased marketing and selling G4 joists after learning the joists were off-gassing dangerous amounts of formaldehyde.
¶ 127 For these reasons, we hold that the trial court did not err by denying Homes and Mandarin's motion for judgment notwithstanding the verdict on their CCPA claim. In light of our holding regarding the public impact element, we need not consider the other elements of their CCPA claim. See Martinez , 969 P.2d at 223.
5. Homes and Mandarin's Request for Attorney Fees Under the CCPA
¶ 128 Homes and Mandarin request an award of their attorney fees under the fee-shifting provision of the CCPA. § 6-1-113(2)(b). Because Homes and Mandarin did not prevail on their CCPA claim, they are not entitled to such attorney fees. See id.
506 P.3d 132 IV. Conclusion
¶ 129 The judgment entered against Weyerhaeuser on Homes and Mandarin's claims for negligence, negligent misrepresentation, and fraudulent concealment is reversed; the judgment entered against Homes and Mandarin on their CCPA claim is affirmed; and the order denying Homes and Mandarin's motion for a directed verdict on their warranty claims is affirmed. The case is remanded to the trial court with instructions to dismiss Homes and Mandarin's claims for negligence, negligent misrepresentation, and fraudulent concealment with prejudice, and for further proceedings consistent with this opinion.
JUDGE FURMAN concurs.
JUDGE BROWN specially concurs.
JUDGE BROWN, specially concurring.
¶ 130 I concur in the majority's reasoning and in the result reached. I write separately, however, to emphasize that I view our holding in Part II as a narrow one, driven by the specific facts of this case.
¶ 131 In determining that Weyerhaeuser NR Company's duties to refrain from negligently or fraudulently misrepresenting or concealing material information regarding the quality and safety of the joists it sold to Dream Finders Homes LLC and DFH Mandarin, LLC, were not independent of the parties' contract, the majority does not rely on any provision in any document contained within the network of contracts. Instead, it concludes that the implied duty of good faith and fair dealing subsumed these duties. Supra ¶¶ 66-69.
¶ 132 As the majority accurately explains, precedent exists for concluding that the implied duty of good faith and fair dealing can subsume a claim for fraud in the performance of a contract. See, e.g. , Top Rail Ranch Ests., LLC v. Walker , 2014 COA 9, ¶ 37, 327 P.3d 321, 329 ; Hamon Contractors, Inc. v. Carter & Burgess, Inc. , 229 P.3d 282, 293 (Colo. App. 2009). And, on the facts of this case — including the nature of the transaction, the sophistication of the contracting parties, the nature of the alleged misrepresentations and omissions, the fact that Weyerhaeuser fulfilled its warranty obligations relative to the defective product, and the express contractual limitations precluding recovery of consequential damages under any theory of liability — I agree that the duties Weyerhaeuser allegedly breached by misrepresenting or concealing quality and safety information about the joists are not independent of the contract.
¶ 133 But I am concerned that our holding today may be misused. It could be read to encourage a contracting party to engage in fraudulent conduct during the course of a contractual relationship and then hide behind the economic loss rule to avoid economic damages caused by the fraud simply by arguing that fraudulent conduct necessarily breaches the duty of good faith and fair dealing implied in every contract. In my view, the fact that every contract in Colorado includes the implied duty of good faith and fair dealing cannot mean that the economic loss rule bars all post-contractual fraud. Indeed, if the case law regarding the economic loss rule makes any one thing clear, it is that there are no bright line rules that any particular torts (e.g. negligence or fraud) are always barred by, or never barred by, the economic loss rule. See Hamon Contractors, Inc. , 229 P.3d at 291.
¶ 134 So, although I agree with the disposition of this case, I believe the holding should be read narrowly. And I highlight what appears to be a renewed current running through recent case law: The economic loss rule should rarely apply to preclude intentional tort claims. See Bermel v. BlueRadios, Inc. , 2019 CO 31, ¶ 20 n.6, 440 P.3d 1150, 1154 n.6 ("[T]he economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation."); McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Ctrs.-Centerra LLC , 2021 COA 2, ¶ 74, 486 P.3d 439, 454 (relying on Bermel to conclude that, although the conduct underlying claims for fraudulent concealment, intentional interference with contractual obligations, and intentional inducement of breach of contract could also support a claim for 506 P.3d 133 breach of contract, the economic loss rule did not apply). This is one of those rare cases.